[No. 84362-7. En Banc.]
Argued June 28, 2011.     Decided January 5, 2012.

MATHEW MCCLEARY ET AL., *Respondents*, v. THE STATE OF
WASHINGTON, *Appellant*.

*Robert M. McKenna, Attorney General, Maureen A. Hart, Solicitor General, David A. Stolier, Senior Assistant,* and *William G. Clark, Senior Counsel,* for appellant.

*Thomas F. Ahearne, Christopher G. Emch, Adrian U. Winder,* and *Kelly A. Lennox* (of *Foster Pepper PLLC*), for respondents.

*Sarah A. Dunne, Nancy Lynn Talner,* and *Cynthia B. Jones* on behalf of American Civil Liberties Union of Washington Foundation, amicus curiae.

*Lester Porter Jr., Kathleen J. Haggard,* and *Grant D. Wiens* on behalf of Washington Association of School Administrators and Washington Association of School Principals, amici curiae.

*Hozaifa Y. Cassubhai* and *David C. Tarshes* on behalf of League of Education Voters Foundation, amicus curiae.

*Michael E. Bindas* on behalf of Institute for Justice–Washington Chapter, amicus curiae.

¶1 STEPHENS, J. — This case challenges the adequacy of state funding for K-12 education under article IX, section 1 of the Washington State Constitution. Unlike recent challenges to the State's funding of education, which have focused on discrete aspects of school finance such as staff

compensation[1] and special education,[2] this case concerns the overall funding adequacy of K-12 education. The only other time we have reviewed this type of challenge to school funding was more than 30 years ago in *Seattle School District No. 1 v. State*, 90 Wn.2d 476, 585 P.2d 71 (1978).

¶2 Now, as then, the factual and legal background of the case, and the necessity of adequately addressing the number of issues involved, cause this opinion to reach great length. We therefore summarize the central portions of our decision:

- The judiciary has the primary responsibility for interpreting article IX, section 1 to give it meaning and legal effect.

- The legislature has the responsibility to augment the broad educational concepts under article IX, section 1 by providing the specific details of the constitutionally required "education."

- Article IX, section 1 confers on children in Washington a positive constitutional right to an amply funded education.

- The word "education" under article IX, section 1 means the basic knowledge and skills needed to compete in today's economy and meaningfully participate in this state's democracy.

- The current substantive content of the requisite knowledge and skills for "education" comes from three sources: the broad educational concepts outlined in *Seattle School District*; the four learning goals in Engrossed Substitute House Bill (ESHB) 1209, 53d Leg., Reg. Sess. (Wash. 1993); and the State's essential academic learning requirements (EALRs).

- The "education" required under article IX, section 1 consists of the *opportunity* to obtain the knowledge

---

[1] *Fed. Way Sch. Dist. No. 210 v. State*, 167 Wn.2d 514, 219 P.3d 941 (2009).

[2] *Sch. Dists.' Alliance for Adequate Funding of Special Educ. v. State*, 170 Wn.2d 599, 244 P.3d 1 (2010).

and skills described in *Seattle School District*, ESHB 1209, and the EALRs. It does not reflect a right to a guaranteed educational outcome.

- The program of basic education is not etched in constitutional stone. The legislature has an obligation to review the basic education program as the needs of students and the demands of society evolve.

- The word "ample" in article IX, section 1 provides a broad constitutional guideline meaning fully, sufficient, and considerably more than just adequate.

- Ample funding for basic education must be accomplished by means of dependable and regular tax sources.

- The State has not complied with its article IX, section 1 duty to make ample provision for the education of all children in Washington.

- The legislature recently enacted a promising reform package under ESHB 2261, 61st Leg., Reg. Sess. (Wash. 2009), which, if fully funded, will remedy deficiencies in the K-12 funding system.

- This court defers to the legislature's chosen means of discharging its article IX, section 1 duty but retains jurisdiction over the case to help facilitate progress in the State's plan to fully implement the reforms by 2018.

## BACKGROUND

*Seattle School District No. 1 v. State*

¶3 In 1975, the Seattle School District suffered a double levy failure in an attempt to raise funds to carry on the state-mandated education program. *Seattle Sch. Dist.*, 90 Wn.2d at 485. At the time, the legislature authorized local districts to supplement insufficient state funding through special excess levy elections. *Id.* Reliance on levies to fund local maintenance and operations budgets had ballooned

from 6.8 percent of districts' total budgets in 1960 to 25.6 percent in 1974. *Id.* at 524. "Faced with a deteriorating physical plant, a reduction in budgets for books, supplies, staff and programs and a double levy failure," the Seattle School District sued, alleging that the State had failed to discharge its paramount duty under article IX, sections 1 and 2 to provide ample funding for education through a general and uniform system of public schools. *Id.* at 486. Following a nine-week trial before Judge Robert Doran of the Thurston County Superior Court, the court agreed with the school district, declaring that the State's funding system—and specifically its overreliance on local levies—was unconstitutional. *Id.* at 486-87.

¶4 On direct review, this court took the opportunity to define the nature of the State's obligation under article IX, section 1. We held that article IX, section 1 imposes a judicially enforceable affirmative duty on the State to make ample provision for the education of all children residing within its borders. *Id.* at 520. We explained that the State's duty gives rise to a corresponding right of school children to "have the State make ample provision for their education." *Id.* at 512. And because the constitution describes the State's duty as "paramount," the corresponding right is likewise elevated to a paramount status. *Id.*

¶5 Our decision articulated broad guidelines for the meaning of the word "education" in article IX, section 1. *Id.* at 517-18. These guidelines, we explained, are not "fully definitive of the State's paramount duty," but rather they outline the "*minimum* of the education that is constitutionally required." *Id.* at 518. Further, we clarified that the State's duty is not to provide all knowledge and offerings tangentially related to the central thrust of the educational concepts we had outlined—in other words, there is no obligation to provide " 'total education.' " *Id.* at 519. Instead, the "Legislature's obligation [i]s one to provide 'basic education' through a basic program of education." *Id.*

¶6 This court directed the legislature to comply with its duty by "defining and giving substantive meaning" to the

word "education" and the program of basic education. *Id.* at 519-20. In doing so, we declined the invitation to specify standards for staffing ratios, salaries, and other program requirements. *Id.* at 520. We expressed confidence that the legislature would fill in the details consistent with its constitutional duty. *Id.* Our decision noted that "[w]hile the Legislature must *act* pursuant to the constitutional mandate to discharge its duty, the general authority to select the *means* of discharging that duty should be left to the Legislature." *Id.*

¶7 In *Seattle School District*, we described a second aspect of the State's duty under article IX, section 1. *Id.* The constitution, we explained, requires the State to make ample provision for funding a basic education "by means of dependable and regular tax sources." *Id.* This court held that funding a basic education with local levy dollars violates article IX, section 1 because levies are "wholly dependent upon the whim of the electorate," are available on only a temporary basis, and rely on the assessed valuation of real property at the local level. *Id.* at 525. Our decision indicated, however, that schools may rely on levies to fund programs that serve as an " 'enrichment' " to basic education. *Id.* at 526.

¶8 Because the State had not previously defined "basic education," we noted the dilemma in trying to determine whether the State was amply funding basic education under article IX, section 1. *Id.* at 533. Using the three ad hoc definitions of basic education the trial court relied on, we concluded that "State funding was insufficient to provide for any of the suggested definitions of 'basic education' or a basic program of education." *Id.* We accordingly affirmed the trial court, expressing our confidence that the legislature would act to comply with its constitutional duty. *Id.* at 539.

### Basic Education Act of 1977

¶9 After Judge Doran had declared the State's system of funding unconstitutional, but before this court heard the

case on appeal, the legislature enacted the Washington Basic Education Act of 1977 (Basic Education Act). LAWS OF 1977, 1st Ex. Sess., ch. 359. Because of the timing of the legislation, we declined to pass on its constitutionality, explaining that doing so "would amount to an advisory opinion." *Seattle Sch. Dist.*, 90 Wn.2d at 519 n.14; *id.* at 537 (noting that the Basic Education Act was "not before us and any comment thereon would be both dicta and advisory in nature").[3]

¶10 The Basic Education Act outlined a program of basic education consisting of (1) the goal of the school system, (2) the instructional program necessary to achieve that goal, and (3) the funding formula necessary to implement the instructional program. LAWS OF 1977, 1st Ex. Sess., ch. 359, § 1. The legislature declared that the educational program outlined in the Basic Education Act complied with the requirements of article IX, sections 1 and 2. *Id.*

¶11 The Basic Education Act stated that the goal of the school system was "to provide students with the opportunity to achieve those skills, which are generally recognized as requisite to learning," including the ability:

(1) To distinguish, interpret and make use of words, numbers and other symbols, including sound, colors, shapes[,] and textures;

(2) To organize words and other symbols into acceptable verbal and nonverbal forms of expression, and numbers into their appropriate functions;

(3) To perform intellectual functions such as problem solving, decision making, goal setting, selecting, planning, predicting, experimenting, ordering[,] and evaluating; and

(4) To use various muscles necessary for coordinating physical and mental functions.

*Id.* § 2.

---

[3] In a concurrence, Justice Utter opined that the Basic Education Act was properly before us. He described the legislation as a "comprehensive" reform that substantially remedied the deficiencies in the K-12 system. *Seattle Sch. Dist.*, 90 Wn.2d at 547-50 (Utter, J., concurring).

¶12 Section 3 of the Basic Education Act outlined the instructional program that satisfied the goal of the school system. *Id.* § 3(2). The program focused on a 180-day school year and minimum instructional hours in specified subjects. *Id.* § 3(2)(a)-(e).

¶13 Sections 4 and 5 set forth the funding mechanism to implement the new instructional program.[4] The governor and the office of the superintendent of public instruction were directed to develop a "basic education allocation" based on a staffing ratio of at least 50 certificated staff for every one thousand students. *Id.* § 5. These numbers reflected actual staffing practices within some school districts during the mid 1970s. *See* Ex. 1406, at 5-7 (slides 10, 14); Ex. 333; 23 Verbatim Report of Proceedings (VRP) (Oct. 15, 2009) at 5109. The Basic Education Act declared that basic education would be considered fully funded "by those amounts of dollars appropriated by the legislature pursuant to" the basic education allocation. LAWS OF 1977, 1st Ex. Sess., ch. 359, § 4.

### Levy Lid Act of 1977

¶14 At the same time it sought to define and fund basic education in the Basic Education Act, the 1977 legislature also attempted to remedy overreliance on local levy funding through the Levy Lid Act of 1977. LAWS OF 1977, 1st Ex. Sess., ch. 325. The Levy Lid Act of 1977 capped levy funding at 10 percent of a school district's annual budget. *Id.* § 4. To cushion the impact of substantial and immediate reductions, a grandfather clause allowed certain districts with historically high reliance on levy funding to collect more than 10 percent. *Id.*; 4 VRP (Sept. 3, 2009) at 934.

¶15 Over the years, the legislature has amended the Levy Lid Act of 1977 numerous times. Ex. 192, at 7. By 2009, the legislature had raised the levy lid for all districts

---

[4] Funding for student transportation and special education was outlined in sections 6 and 7 of the act. *Id.* §§ 6-7.

to 24 percent of their levy base, i.e., the sum of state and federal revenues from the prior year. *Id.*; 17 VRP (Sept. 30, 2009) at 3901-02. Approximately 90 districts continued to be grandfathered in at higher levy lids between 24 and 34 percent. Ex. 192, at 7. In 2010, the legislature again raised the levy lid. LAWS OF 2010, ch. 237, § 1(6). Currently, all districts can raise up to 28 percent of their levy base, and grandfathered districts can raise between 28 and 38 percent. H.B. REP. on Substitute H.B. 2893, at 2-3, 61st Leg., Reg. Sess. (Wash. 2010). The reason for the latest increase was to alleviate the risk of insolvency for many districts. *Id.* at 4.

## *Remediation and Transitional Bilingual Education*

¶16 In 1979, the legislature enacted two programs targeted at students needing additional assistance to obtain a basic education. The Remediation Assistance Act provided enhanced resources to students from disadvantaged backgrounds who were falling behind academically. LAWS OF 1979, ch. 149. The Transitional Bilingual Instruction Act of 1979 allocated additional staff and other resources to assist students with limited English proficiency. LAWS OF 1979, ch. 95.

## *Seattle School District v. State, 1983 Trial Court Ruling*

¶17 In 1982, a group of school districts filed a lawsuit following up on the *Seattle School District* suit and challenging the constitutionality of the Basic Education Act and the funding provided to schools for the 1981-83 biennium. Clerk's Papers (CP) at 274. The case was appropriately assigned to Judge Doran of the Thurston County Superior Court. In addressing the plaintiffs' challenges, Judge Doran began by defining the scope of the State's duty under article IX, section 1 in light of recent legislative enactments. The court declared that "the programs established by the Legislature as necessary to meet the current needs of the children of this State as required by Article IX, Section 1"

included (1) the program requirements in the Basic Education Act; (2) the remediation assistance program established by the Remediation Assistance Act; (3) the transitional bilingual education program established by the Transitional Bilingual Instruction Act of 1979; (4) the program of special education established under the Education for All Act of 1971, LAWS OF 1971, 1st Ex. Sess., ch. 66; and (5) some transportation services. CP at 348-49.

¶18 At the same time, the court declared that, despite the school districts' contention, several other programs were "[n]ot presently included within the programs recognized by the Legislature as mandated by Article IX, Section 1." CP at 352-53. These included, for example, the food services program and extracurricular activities. *Id.*

¶19 Following a lengthy bench trial, Judge Doran declared that the State was not meeting its obligation to fully fund the programs included in its article IX, section 1 duty. CP at 274, 351. Rather than order the legislature to appropriate additional funds, the court expressed its confidence that the legislature would promptly remedy the shortcomings in the funding system. CP at 349. Although the State never appealed the decision, Judge Doran's ruling largely shaped the legislature's design of the basic education program for the next several decades. *See, e.g.*, Ex. 43, at 2.

*Transition to Performance-Based Education System*

¶20 In the years following Judge Doran's ruling, the legislature made several piecemeal reforms to the education system. Ex. 1370, at 3. By the end of the 1980s, however, there was increasing recognition that Washington schools were on the wrong track. *Id.* The school system, it was argued, needed to focus more on whether students were gaining the knowledge and skills necessary for success in the real world, as opposed to whether the students were attending class for a certain number of hours per day. *Id.* Growing discontent with the current system and its lack of

resources led to a teacher strike in the spring of 1991, further stressing the importance of instituting comprehensive reforms. *Id.* at 4; 4 VRP (Sept. 3, 2009) at 958.

¶21 In May 1991, Governor Booth Gardner signed an executive order creating the Governor's Council on Education Reform and Funding (GCERF). Ex. 1370, at 4. The governor commissioned the GCERF to study the entire K-12 program and to recommend how to transition from what many viewed to be a seat-based education system in Washington to a performance-based system. *Id.* The GCERF was asked to design a new system of education that would define the substantive content of the constitutionally required "education" under article IX, section 1 and the funding necessary to put the new system in place. 5 VRP (Sept. 8, 2009) at 971.

### 1. Substitute House Bill (SHB) 5953

¶22 As the GCERF finalized its recommendations, the legislature took its first major step toward adopting a performance-based education system with SHB 5953. Laws of 1992, ch. 141. The legislature acknowledged that the GCERF was developing "broad student learning goals" for legislative adoption later that year. *Id.* § 1. With this in mind, the legislature created the Commission on Student Learning to "continue [the GCERF's] work in identifying necessary student skills and knowledge, to develop student assessment and school accountability systems, and to take other steps necessary to develop a performance-based education system." *Id.* §§ 1, 202. Specifically, SHB 5953 charged the Commission on Student Learning with developing EALRs that incorporated the GCERF's student learning goals. *Id.* § 202(5). The legislation also directed the GCERF to design an assessment system to test students' mastery of the EALRs. *Id.*

### 2. ESHB 1209

¶23 By the spring of 1993, the GCERF had issued its final recommendations and the legislature was poised to

move forward on the reforms initiated under SHB 5953. Ex. 360. ESHB 1209 became the vehicle for instituting many of the GCERF's proposals for transitioning to a performance-based education system. LAWS OF 1993, ch. 336.

¶24 With minor revision, ESHB 1209 adopted the broad student learning goals recommended in the GCERF's final report. Ex. 1370, at 5; 5 VRP (Sept. 8, 2009) at 979. Those goals amended the original learning goals in the Basic Education Act. LAWS OF 1993, ch. 336, § 101. Under ESHB 1209, the new purpose of the Basic Education Act was "to provide students with the opportunity to become responsible citizens, to contribute to their own economic well-being and to that of their families and communities, and to enjoy productive and satisfying lives." *Id.* To further this purpose, the goals of the school system were redesigned "to provide opportunities for all students to develop the knowledge and skills" necessary to:

(1) Read with comprehension, write with skill, and communicate effectively and responsibly in a variety of ways and settings;

(2) Know and apply the core concepts and principles of mathematics; social, physical, and life sciences; civics and history; geography; arts; and health and fitness;

(3) Think analytically, logically, and creatively, and to integrate experience and knowledge to form reasoned judgments and solve problems; and

(4) Understand the importance of work and how performance, effort, and decisions directly affect future career and educational opportunities.

*Id.*

¶25 In addition to adopting new student learning goals under the Basic Education Act, ESHB 1209 provided specific guidance to the Commission on Student Learning. It directed the commission to develop EALRs for each of the four student learning goals, and it set priorities and deadlines to accomplish this task. *Id.* § 202(3)(a). ESHB 1209

likewise set deadlines for implementing the assessment system for testing students' mastery of the EALRs. *Id.* § 202(3)(b). Numerous other reforms were also set in place consistent with the GCERF's recommendations. *See* Ex. 1370, at 5. ESHB 1209 established a joint select committee on education to oversee the progress of implementing the new reforms and to report to the full legislature. LAWS OF 1993, ch. 336, §§ 1001-1002.

¶26 Regarding school finance, ESHB 1209 created a joint legislative fiscal committee to "study the common school funding system" and to "report to the full legislature on its findings and any recommendations for a new funding model." *Id.* § 1007(2). The fiscal committee submitted its report in December 1995. Ex. 1376.

¶27 The report contained a consultant's evaluation that compared Washington's K-12 finance system to a "model" or "optimal" finance system. *Id.* at 41-42. The consultant found that "[w]hen compared to the seven concepts of an optimal school finance system, the Washington school finance system does very well" and "meets or exceeds the expectations set out by nearly all of the concepts." *Id.* at 44. In making this finding, the consultant determined that "[a]ll major areas of school district spending are covered with state responsibility or state involvement in the Washington school finance system." *Id.* The evaluation recommended some reforms "to keep up with national trends" but concluded that "the State of Washington has an excellent school finance system." *Id.* at 48.

¶28 Members of the joint legislative fiscal committee provided a less glowing evaluation. *Id.* at 49. The committee noted that the legislature had not revisited the definition and funding formulas for basic education since Judge Doran's trial court ruling more than 10 years earlier. *Id.* at 50. The committee therefore recommended that the legislature initiate a comprehensive review to determine whether the funding formulas remained valid and whether the State was in fact fully funding basic education. *Id.* Other areas of

concern were also highlighted for study, including whether districts used local levy funds for basic education and whether the disparity in levy lids had set the stage for another lawsuit. *Id.* at 51.

¶29 The report concluded with a list of the funding system's strengths and weaknesses. As strengths, the report listed that the State considered K-12 funding paramount, a high percentage of overall funding came from the State, and state funding for construction surpassed that of other states. *Id.* at 53-54. Weaknesses included too much reliance on levies, funding formulas that were too complex, inadequate funding for administrative salaries, and inadequate funding for basic operational costs such as books and utilities. *Id.* at 52-53. Despite the committee's recommendations, no major funding reforms occurred.

### 3. Development of EALRs and Washington Assessment of Student Learning (WASL)

¶30 Over the next decade, the Commission on Student Learning went to work developing the EALRs and the assessment tools that would measure students' acquisition of the knowledge and skills outlined in the EALRs. The commission created EALRs for each of the four student learning goals listed in ESHB 1209. Eventually, EALRs were developed for nine separate content areas, including reading, math, science, writing, communication, social studies, the arts, health and fitness, and educational technology.[5] Ex. 144. According to the superintendent of public instruction, the EALRs "define what all students should know and be able to do at each grade level." *Id.*

¶31 The EALRs for writing illustrates how the standards work. The writing EALRs actually consists of four separate EALRs, each providing a broad statement of a particular writing skill. Ex. 150. For instance, "EALR 1" for

---

[5] Some of the EALRs have been revised over the years, with new EALRs being introduced in just the last few years, including one for integrated environment and sustainability and one for world languages.

writing states that "[t]he student understands and uses a writing process." *Id.* "EALR 2" states that "[t]he student writes in a variety of forms for different audiences and purposes." *Id.* Each EALR breaks down further into specific components that translate into the skills needed to meet the particular standard. *Id.* To meet the standard in EALR 2, for example, the student must be able to "[a]dapt[ ] writing for a variety of audiences" and "[w]rite[ ] for different purposes." *Id.*

¶32 To test students' mastery of the EALRs, the Commission on Student Learning developed the WASL. The WASL was implemented in 1997, and the State phased it in over several years as additional EALRs came on board.[6]

*Funding for the K-12 System*

¶33 Beginning in 2005, significant reforms to the education system and school finance were again underway. Before addressing those reforms, we pause to describe the framework of the K-12 funding model and how school funding operated at the time.

1. State Funding for the K-12 System

¶34 The state general fund, the largest fund within the state budget, provides the primary means for operating the state government. Ex. 192, at 8. In the 2005-07 biennium, the legislature appropriated approximately $11 billion, or 39.7 percent of the state general fund, to support the 295 school districts that make up the State's K-12 system. *Id.* at 8-10. In addition to dollars from the state general fund, the legislature allocates resources to the K-12 system each year from other accounts designated specifically for education. *Id.* at 9.

¶35 School districts receive money to sustain their operations from several sources. During the 2006-07 school year, state funding made up approximately 72 percent of

---

[6] The State recently replaced the WASL with a new assessment tool.

total revenues to school districts. *Id.* at 11. Local funding, primarily from excess levies, made up about 16 percent of total revenue. *Id.* at 12. Federal funding provided another 9 percent of total district revenue. *Id.* And the remaining 3 percent came from miscellaneous sources, such as charges and fees, rental income, and donations. *Id.*

## 2. Basic Education and Nonbasic Education Funding

¶36 The legislature has divided its funding obligations into two main categories: basic education and nonbasic education. *Id.* at 4-6. Programs and offerings that fall within the legislature's definition of "basic education" are considered nondiscretionary and must be funded regardless of budgetary constraints. 16 VRP (Sept. 29, 2009) at 3530. All other educational programs that the legislature does not consider "basic education" may be reduced or eliminated. *Id.* at 3521, 3531-32.

¶37 At the time this case went to trial, six programs fell within the legislature's definition of "basic education": (1) the basic education program outlined in the Basic Education Act, (2) special education, (3) some pupil transportation, (4) the learning assistance program (remediation), (5) transitional bilingual education, and (6) the institutional education program for juveniles in detention. Ex. 192, at 4-5; Ex. 43, at 2. As noted, state-level funding for "basic education" is not subject to debate, even in times of budget shortfalls. 16 VRP (Sept. 29, 2009) at 3530.

¶38 The State also funds many programs it does not consider part of "basic education." Ex. 192, at 6. For instance, the student achievement fund, which was originally passed as Initiative 728, allocates money for class-size reductions, professional development, and other resources designed to improve student learning. *Id.* at 27. Another program, originally passed as Initiative 732, provides annual cost-of-living adjustments for school staff. *Id.* A levy equalization program allocates additional state money to property-poor districts that struggle to raise adequate levy

funds. *Id.* at 6; 20 VRP (Oct. 12, 2009) at 4398. The State also funds learning improvement days for teachers. Ex. 192, at 6.

¶39 Unlike with "basic education" programs, the legislature can, and often does, cut or reduce these programs in light of state budgetary constraints. 16 VRP (Sept. 29, 2009) at 3531-32. For example, the legislature fully funded cost-of-living adjustments under Initiative 732 in the 2007-09 biennium, but the adjustments were completely eliminated in the 2009-11 budget. *Id.* at 3624.

3. General Apportionment Funding Formula

¶40 Until recently, the general apportionment formula, as outlined in the Basic Education Act, provided the fundamental means of funding basic education.[7] Ex. 192, at 4. General apportionment was commonly referred to as the basic education funding formula or the basic education allocation, although, in reality, it represented only one part of what the legislature considered "basic education." *See, e.g.*, Ex. 43, at 4. Every student in the K-12 system, including students who received supplemental funding for special education or remediation, generated revenue under the general apportionment formula. Ex. 192, at 4. General apportionment represented approximately 66 percent of total state funding to school districts, making it the largest state expenditure for education. *Id.* at 6.

¶41 The general apportionment formula consisted of four main components: student enrollment, staffing ratios, staff salaries and benefits, and nonemployee related costs (commonly referred to as NERCs). Ex. 43, at 4-5.

¶42 In its simplest terms, the formula began to take shape as each school district reported the number of full-time equivalent students enrolled throughout the year. Ex.

---

[7] The legislature recently adopted major structural changes to the definition and funding of basic education, which took effect on September 1, 2011. LAWS OF 2009, ch. 548 (ESHB 2261); LAWS OF 2010, ch. 236 (SHB 2776). We discuss those changes more fully below.

330, at 5. These numbers were then averaged together to generate an overall count of student enrollment for the school district. *Id.*

¶43 With this count in hand, the State multiplied student enrollment by various ratios to determine the number of staff for the school district in each staffing category: (1) certificated instructional staff (teachers, counselors, librarians, nurses, etc.), (2) certificated administrative staff (principals, superintendents, etc.), and (3) classified staff (aides, bus drivers, clerical staff, etc.). Ex. 43, at 4. These ratios appeared in the Basic Education Act. Former RCW 28A.150.260(2)(b) (2006). For example, the Basic Education Act set out a ratio of 46 certificated instructional staff and 2 certificated administrative staff for every one thousand students in grades 4 through 12.[8] *Id.* These ratios represented a snapshot of actual staffing practices within some districts just before the legislature enacted the Basic Education Act in 1977. *See* Ex. 1406, at 5-7 (slides 10, 14); Ex. 333; 23 VRP (Oct. 15, 2009) at 5109.

¶44 The State multiplied student enrollment by the staffing ratios in the Basic Education Act to generate a staffing unit for each staff category. Ex. 43, at 4. A high school of 500 students, for example, would have had 23 certificated instructional staffing units. The State then took this figure and multiplied it by state-recognized salary and benefit levels to arrive at an overall dollar amount.[9] *Id.* at 4-5.

¶45 The final component of the general apportionment formula related to NERCs, those costs other than salary and benefits. *Id.* at 5. NERCs included items such as

_____

[8] Importantly, the ratio for certificated instructional staff did not translate into class sizes. Ex. 1579, at 69. For instance, 46 certificated instructional staff to one thousand students yielded a ratio of 21.7 students per instructional staff. *Id.* But because certificated instructional staff also included nurses, counselors, librarians, etc., class sizes tended to be larger than 21.7 students. *Id.*

[9] The method of calculating teacher and other staff salaries is complex. A description of this process appears in our recent decision in *Federal Way School District*, 167 Wn.2d at 518-21.

instructional supplies, textbooks, equipment, utilities, technology, and insurance. *Id.*; Ex. 330, at 8. The State allocated a certain dollar amount for NERCs for each certificated staff unit. Ex. 43, at 5. In the 2006-07 school year, that number was $9,476. *Id.*

¶46 To illustrate, a 500-student high school would have generated 23 certificated instructional staff units and 1 certificated administration staff unit. With 24 total certificated staffing units, the school would have received $227,424 for NERCs in the 2006-07 school year ($9,476 x 24 certificated staffing units = $227,424). The State would have then added $227,424 to the salary and benefit calculations, and the sum total, with other minor adjustments, would have constituted the general apportionment.

¶47 With limited exceptions, school districts retained substantial local control over how they spent general apportionment funds. *See, e.g.*, former RCW 28A.150.260(2)(a) ("The formula shall be for allocation purposes only."), (c) (stating that "the distribution formula developed pursuant to this section shall be for state apportionment and equalization purposes only and shall not be construed as mandating specific operational functions of local school districts"). For example, certificated instructional staff included teachers, librarians, counselors, and other instructional staff requiring certification. Because the general apportionment formula did not mandate staffing levels for each of these discrete categories, a school could decide not to allocate any of its general apportionment funding to librarians or counselors—i.e., not staff those positions—and instead shift the funds to hiring more teachers.

¶48 The legislature considered basic education to be fully funded by the amount of dollars it appropriated under the general apportionment formula and the funding formulas for its other "basic education" programs. Former RCW 28A.150.250 (1990).

*Washington Learns*

¶49 In 2005, the legislature realized that "[m]ore than a quarter of a century has passed since the current school finance system was first created" and "the challenges facing our schools and students have grown and changed dramatically during that time." LAWS OF 2005, ch. 496, § 1(2). To respond to these changes, the legislature commissioned a comprehensive study of the entire state education system: early learning, K-12, and higher education. *Id.* § 3. The project was called "Washington Learns." The legislature created a steering committee, chaired by the governor, to oversee the project and the work of three advisory committees, one for each level of the education system. *Id.* § 2. The legislature specified that a central piece of Washington Learns would be a "comprehensive K-12 finance study" that looked at "[p]otential changes to the current finance system." *Id.* § 3(2)(d).

¶50 After nearly a year and a half of study and review, the steering committee produced the Washington Learns final report. Ex. 16 (Washington Learns majority and minority reports). The report declared that "[e]ducation is the single most important investment we can make for the future of our children and our state." *Id.* at 4. At the same time, the report noted several troubling statistics about the state of the school system in Washington. Fewer than 50 percent of children entered kindergarten ready to learn. *Id.* at 5. Only 74 percent of ninth graders graduated from high school with their peers. *Id.* And younger workers were less educated than their older counterparts. *Id.*

¶51 In light of these findings, the Washington Learns report recommended several initiatives "to bring us closer to a world-class, learner-focused, seamless education system for Washington." *Id.* at 18. The report also proposed 10 long-term goals aimed at raising overall student achievement. *Id.* at 9, 38. It recommended that the governor create a council by executive order to track the progress of attaining the new goals. *Id.* at 38.

¶52 As to funding reform, the report noted that "[t]oday, the K-12 education system is still financed by the thirty-year-old statutory formula of the Basic Education Act." *Id.* at 48. The report found that, despite the shift to a performance-based system more than a decade earlier, "the funding model for K-12 education has not been updated to reflect the new expectations and has not addressed the question of how to use resources most effectively in order to improve student outcomes." *Id.* The report further surmised that "[s]table and significantly increased funding is required to support the evolving needs of our education system." *Id.* at 49. It concluded by expressing the resolve of the Washington Learns steering committee to work over the next two years "to develop a ten-year implementation strategy for stable and significantly increased funding to support a world-class, learner-focused, seamless education system for Washington." *Id.* at 50.

¶53 The minority report, authored by Representative Glenn Anderson, expressed dissatisfaction with this result. It pointed out that the legislature's primary reason for commissioning the Washington Learns project in the first place was to reform K-12 finance—something the steering committee simply did not do. *Id.* at 51 (*"My greatest concern is that the Steering Committee failed to meet the mandate given it by the authorizing legislation, and largely dodged the difficult issues in K-12 finance whose resolution many legislators and members of the K-12 community intended as the study's highest priority.*"). The minority report argued that "[a]fter 25 years of concerns, at least 17 previous legislative studies, [and] 18 months of additional investigation by Washington Learns costing $1.7 million" the public deserved "more than good rhetoric and a list of vague policy options that do not address the fundamental issues about education finance in our state." *Id.* at 53.

¶54 A significant portion of the $1.7 million spent on Washington Learns paid for a group of consultants to perform a comprehensive review of Washington's K-12 finance

system. 7 VRP (Sept. 10, 2009) at 1432. The study, conducted by professors Lawrence Picus of the University of Southern California and Allan Odden of the University of Wisconsin-Madison, sought to measure the adequacy of school funding in Washington using an evidence-based approach. Ex. 364, at 2-3. This approach identifies the key characteristics of a high-quality education program based on a body of research and then targets existent and new funding toward those research-based reforms. *Id.* at 3. The Picus and Odden study proposed across-the-board reforms to Washington's K-12 system to bring its structure and funding into alignment with what the study referred to as the "prototypical school model." *Id.* at 17-18. According to one informed observer, the final Washington Learns report did not endorse the Picus and Odden reforms because adopting the prototypical school model would have cost the State several billion dollars. 8 VRP (Sept. 14, 2009) at 1705-07.

¶55 In response to Washington Learns, the legislature enacted several minor reforms to the education system in Engrossed Second Substitute Senate Bill (E2SSB) 5841. LAWS OF 2007, ch. 400. E2SSB 5841 revised the Basic Education Act, tinkering slightly with the wording of the four enumerated student learning goals. *Id.* § 1. It also implemented funding for a program of voluntary all-day kindergarten, beginning with schools with the highest levels of poverty. *Id.* § 2. The legislation, however, expressly excluded the all-day kindergarten program from the definition of "basic education." *Id.* § 2(3).

*Transportation Funding Study*

¶56 In late 2006, the Joint Legislative Audit and Review Committee released a report showing that the State underfunded to/from student transportation by between $93 million and $114 million each school year. Ex. 357. The report found that the legislature had not changed the student transportation funding formula since its adoption

in the early 1980s. *Id.* As a result, the formula did not reflect actual to/from transportation costs. Ex. 357, at 33.

¶57 In response to the report, the legislature created a pupil transportation advisory committee to conduct a study and recommend a new transportation funding formula. LAWS OF 2007, ch. 139, § 2; 23 VRP (Oct. 15, 2009) at 5097-99. This process confirmed the inadequacies of the transportation funding formula and resulted in a proposal for a new formula. Ex. 52.

*Basic Education Finance Task Force*

¶58 In the spring of 2007, the legislature commissioned the Basic Education Finance Task Force to pick up where Washington Learns left off. E2SSB 5627, LAWS OF 2007, ch. 399. E2SSB 5627 directed the task force to address the details of implementing a "new comprehensive K-12 finance formula or formulas that will provide Washington schools with stable and adequate funding as the expectations for the K-12 system continue to evolve." *Id.* § 1. Specifically, the task force was to (1) review the current definition of basic education and the associated funding formulas, (2) develop options for a new funding model, and (3) propose a new definition of basic education that aligns with the expectations of the education system identified in the Washington Learns report. *Id.* § 2(1).[10] Following 17 months of study, the task force issued its final report to the legislature. Ex. 124.

¶59 The report began by recommending a new definition for "basic education." The task force proposed defining "basic education" as "the opportunity for all students to meet new, more rigorous high school graduation requirements (Core 24) proposed by the State Board of Educa-

---

[10] The task force did not consider reforms to the funding models for school construction and transportation, as those topics were addressed by separate task forces. 8 VRP (Sept. 14, 2009) at 1591-92.

tion."[11] *Id.* at ii. To meet this new standard, the report suggested adding two offerings to the basic education program: an early learning program (preschool) for low-income children and voluntary full-day kindergarten for all children. At the same time, the task force recommended retaining intact the other offerings historically considered part of "basic education." *Id.* at 4-8.

¶60 The report went on to recognize that "the state is obligated to fund a program of education sufficient to provide every child in Washington with the opportunity to meet the graduation requirements set by the State Board of Education." *Id.* at ii. To this end, the task force proposed a new funding system based on hypothetical model schools that established funding levels for the various aspects of a model instructional program. *Id.* at 7-13. For example, the model high school had 600 students, average class sizes of 25, 1.8 administrators, and a NERCs allocation per student of $1,086. *Id.* at 8-10. This funding model was based, in large part, on the Picus and Odden study conducted for Washington Learns. 8 VRP (Sept. 14, 2009) at 1628.

¶61 In addition to changes to the definition and funding of basic education, the task force recommended several other key reforms. It proposed adopting a new budgeting and accounting system that better tracked student achievement vis-á-vis expenditures for particular programs. Ex. 124, at 22-23. The new system would distinguish between state, federal, and local expenditures, allowing policy makers to track the source and flow of inputs. *Id.*

¶62 A new compensation system for teachers was also proposed, focusing more on performance incentives than on attainment of additional teacher education—a factor that

---

[11] Core 24 is a program that increases the number of credits required for graduation from 19 to 24 and better aligns the credits to the Higher Education Commission's requirements for admission to a four-year college in Washington. 10 VRP (Sept. 16, 2009) at 2251; 13 VRP (Sept. 22, 2009) at 2767. The additional credits require one additional class period per day and increase the yearly instructional hours from 1,000 to 1,080. 10 VRP (Sept. 16, 2009) at 2252; 13 VRP (Sept. 22, 2009) at 2759.

research showed had no correlation to student achievement. *Id.* at 15-21. Because effective teaching was seen as the single most important factor in improving student performance, the task force also recommended increasing state-funded professional development days from 2 to 10. *Id.* at 15. For each reform outlined in the report, the task force proposed a phase-in period of six years. *Id.* at 26-28.

¶63 Unlike previous studies, the task force's final report contained a cost estimate of the proposed reforms. *Id.* at 24. Using various expenditure models, the task force concluded that full implementation of the reforms would increase state funding for education by $6.3 billion to $8.9 billion per biennium.[12] *Id.*

¶64 Another unique aspect of the final report was a projection of the expected effect of adopting the task force's recommendations, expressed in terms of increased graduation rates. *Id.* at 25-26. The report predicted that after 14 years under the reformed K-12 system, on-time graduation rates would increase to 81 percent from the current 72.5 percent.[13] *Id.*

*Comprehensive Education Reform: ESHB 2261*

¶65 After receiving the task force's final report, in the spring of 2009 the legislature enacted ESHB 2261 and laid the foundation for comprehensive reforms to the program of basic education and the K-12 funding system. Laws of 2009, ch. 548, § 1(2) (declaring the legislature's intent to institute "bold reforms to the entire educational system").

¶66 Consistent with the task force's final report, ESHB 2261 began by redefining "basic education." It outlined "basic education" in terms of (1) the instructional program of basic education, (2) the institutional program (for juve-

---

[12] The range of estimates reflected different assumptions about reforms to teacher compensation and the uncertainty inherent in such a complex cost estimate. Ex. 124, at 24.

[13] The projection estimated that the graduation rate could be as high as 90 percent, but in most cases it would be between 78 and 84 percent. Ex. 124, at 25.

niles in detention), and (3) student transportation. *Id.* § 101(2). ESHB 2261 broadened the instructional program of basic education by specifically adding instruction in the EALRs, "Core 24," and the program for highly capable students. *Id.* § 104(3). At the same time, the legislation preserved the historically recognized basic education offerings: remediation, transitional bilingual education, and special education. *Id.* ESHB 2261 also added voluntary full-day kindergarten[14] to the definition of "basic education," and it increased yearly instructional hours from 1,000 to 1,080 for grades 7-12 to accommodate the new Core 24 requirements. *Id.* § 104(2).[15]

¶67 In addition to expanding the definition of "basic education," ESHB 2261 instituted bold reforms to the K-12 funding system. Taking a cue from the Basic Education Finance Task Force, ESHB 2261 adopted the prototypical school model. *Id.* § 106. The legislation stopped short, however, of setting out the details of the new funding structure. *See, e.g., id.* § 106(3)(c). Unlike the task force report and the Picus and Odden study, ESHB 2261 did not outline specific class sizes, staffing ratios for administrators and classified staff, or dollar allocations for NERCs (which it renamed "materials, supplies, and operating costs" or MSOCs). *Id.* § 106(3)-(4). Instead, ESHB 2261 created a funding formula technical work group to "[d]evelop the details of the funding formulas." *Id.* § 112(2)(a). ESHB 2261 essentially put up the scaffolding for a new funding mechanism but left the finishings for a later day.[16]

---

[14] Although the State had already started phasing in voluntary full-day kindergarten in 2007, the legislature did not consider it part of the State's "basic education" obligations. Laws of 2007, ch. 400, § 2(3).

[15] ESHB 2261 added preschool for at-risk students to the definition of "basic education," but this portion of ESHB 2261 was ultimately vetoed. Laws of 2009, ch. 548 (governor's note on partial veto).

[16] ESHB 2261 described how the prototypical school model operates:

The use of prototypical schools for the distribution formula does not constitute legislative intent that schools should be operated or structured in a

¶68 ESHB 2261 also instituted new requirements for teacher certification and development geared toward improving student learning. The legislature acknowledged as well that "attract[ing] and retain[ing] the highest quality educators . . . require[s] increased investments." *Id.* § 601. ESHB 2261 therefore declared the legislature's intent to "enhance the current salary allocation model," and it commissioned a compensation work group to issue a report to the legislature by December 2012 recommending the details of a new salary model. *Id.*

¶69 ESHB 2261 also created a separate local funding work group to develop options for improving the system of supplemental funding with local levies. *Id.* §§ 301-302. Further, a new transportation funding formula was adopted, with a phase-in deadline of 2013. *Id.* §§ 304-311.

¶70 Another significant reform in ESHB 2261 was the creation of a new data system intended to measure the cost effectiveness of programs by linking program expenditures with student performance data. *Id.* §§ 201-203. As recommended by the Basic Education Finance Task Force, the new system was to provide for separate accounting of state, federal, and local revenues and costs. *Id.* § 202(3)(h). When completed, the new data system would allow the legislature to "make rational, data-driven decisions" about which educational programs increase student achievement and whether the program of basic education meets student needs. *Id.* § 1(3). As one expert opined, this particular reform laid the foundation for one of the best data systems in the country for studying the relationship between finan-

---

similar fashion as the prototypes. Prototypical schools illustrate the level of resources needed to operate a school of a particular size with particular types and grade levels of students using commonly understood terms and inputs, such as class size, hours of instruction, and various categories of school staff. It is the intent that the funding allocations to school districts be adjusted from the school prototypes based on the actual number of annual average full-time equivalent students in each grade level at each school in the district and not based on the grade-level configuration of the school to the extent that data is available.

LAWS OF 2009, ch. 548, § 106(3)(a).

cial inputs and student achievement. 21 VRP (Oct. 13, 2009) at 4566, 4610, 4657.

¶71 To oversee the phase in of ESHB 2261 and the various work groups established under the bill, the legislation created the Quality Education Council (QEC). Laws of 2009, ch. 548, § 114. Its initial report to the legislature was issued January 1, 2010. *Id.* § 114(5)(a).

¶72 For all its reforms, ESHB 2261 did not contain any specific funding levels, nor did it require the infusion of resources to schools in any later appropriations bill. 6 VRP (Sept. 9, 2009) at 1226. Rather, the legislature declared its intent to implement the details of ESHB 2261 through a phased-in approach as recommended by the QEC, with full implementation by 2018. Laws of 2009, ch. 548, § 114(5)(b)(iii).

*QEC Initial Report*

¶73 The QEC's initial report to the legislature in January 2010 began by expressing its bleak perception of the school finance system. It noted that "[s]chool districts use most of their local revenues (largely levy and equalization) to hire extra staff and make up for shortfalls in transportation, operating costs, supplies, special education services, and state salary allocations." Wash. Office of Superintendent of Pub. Instruction, Quality Education Council, Initial Report to the Governor & Legislature (Jan. 13, 2010), *available at* http://www.k12.wa.us/qec/pubdocs/QEC2010report.pdf. According to the QEC, "[m]ost of these costs are clearly a state responsibility." *Id.* The report further described how "[f]unding studies have already confirmed that our state pays for too few instructional and operating staff, that our salary allocations are no longer consistent with market requirements, and that operating costs are woefully underfunded." *Id.*

¶74 Against this backdrop, the QEC offered 13 recommendations for the 2010 legislature to begin implementing ESHB 2261. *Id.* at i-iii. The QEC began by recommending

that the legislature enact the details of the new funding formulas under the prototypical school model. *Id.* at 2-3. This change would not involve a new infusion of resources into the system, but rather a cost-neutral shift from the old funding model to the new prototypical school model. *Id.* In other words, the first step in the transition would take actual spending levels from the 2009-10 school year and recast those dollars in terms of the prototypical school model for the 2011-12 school year. *Id.*

¶75 Recognizing that a cost-neutral shift to the prototypical school model would do little to remedy funding shortfalls, the QEC recommended several enhancements to funding levels. It proposed that the legislature begin immediately phasing in increased dollars for MSOCs[17] to achieve full funding by 2014 rather than 2018.[18] *Id.* at 5-6. The QEC further recommended bumping up the start date for phasing in the new transportation funding formula, as transportation funding in the 2008-09 school year had fallen short by $115 million and was projected to be short by $130 million in 2009-10. *Id.* at 3-4. In addition, the QEC encouraged the legislature to continue phasing in all-day kindergarten, and it recommended implementing reductions in K-3 class sizes immediately. *Id.* at 7-9. The cost estimate for these reforms was projected at approximately $355.5 million for the 2011-12 fiscal year. *Id.* at 20.

*Details of the Prototypical School Model: SHB 2776*

¶76 The 2010 legislature enacted many of the QEC's recommendations into law with SHB 2776. Laws of 2010, ch. 236. Most importantly, SHB 2776 set forth the details of the new prototypical school model: class sizes, staffing ratios, and a specific allocation for MSOCs on a per-student basis. *Id.* § 2.

---

[17] As noted, MSOC (materials, supplies, and operating costs) is the new acronym for what the State called NERCs under the former funding system.

[18] According to the QEC report, to reach full funding of MSOCs, state funding has to double.

¶77 SHB 2776 also adopted many of the QEC's recommended enhancements to funding levels. *Id.* § 1(3). First, beginning in the 2011-13 biennium, SHB 2776 required the legislature to phase in increased funding for MSOCs to achieve full funding by the 2015-16 school year. *Id.* § 2(8)(b). Second, SHB 2776 mandated that reductions in K-3 class sizes begin during the 2011-13 biennium, with class sizes to be reduced to 17 students per classroom by the 2017-18 school year. *Id.* § 2(4)(b). Third, the legislature was to phase in the new transportation funding formula beginning in the 2011-13 biennium. *Id.* § 8(1). Lastly, SHB 2776 required the legislature to continue phasing in full-day kindergarten to reach statewide implementation by the 2017-18 school year. *Id.* § 4(1).

¶78 In addition to mandating these funding enhancements, SHB 2776 expedited the deadlines for both the compensation work group and the local funding work group, requiring their final reports six months earlier than originally planned under ESHB 2261. *Id.* §§ 6(5), 7(6). SHB 2776 also gave the local funding work group the specific task of reporting on options for the school districts' use of local levy funds that are to come available as the State rolls out increased funding for MSOCs and transportation. *Id.* § 6(3).

*2011-13 Operating Budget*

¶79 Following a special session, the legislature passed the state operating budget for the 2011-13 biennium on May 25, 2011. LAWS OF 2011, 1st Spec. Sess., ch. 50. Anticipating the transition to the prototypical school model, the budget implemented several of the enhancements outlined in SHB 2776. For instance, the budget provided funding for transportation under a new transportation funding formula. LAWS OF 2011, 1st Spec. Sess., ch. 50, § 505(2)(a). It also fully funded voluntary all-day kindergarten for 21 percent of school districts in 2011-12 and 22 percent of districts in 2012-13. *Id.* § 502(11). Further, the budget

funded a reduction in K-3 class sizes, allocating $33.6 million to reduce class sizes from 25.23 students to 24.10 students in those schools with the highest levels of poverty. WASH. STATE SENATE WAYS & MEANS COMM., 2011-13 OPERATING BUDGET OVERVIEW, SECOND ENGROSSED SUBSTITUTE HOUSE BILL 1087, at 7 (June 3, 2011), http://leap.leg.wa.gov/leap/Budget/Detail/2011/SOOverview0603.pdf; *see also* LAWS OF 2011, 1st Spec. Sess., ch. 50, § 502(2)(c)(i)-(ii).

¶80 Despite these measures, overall K-12 funding—including funding for basic education—sustained massive cuts in the 2011-13 operating budget. Teacher and staff salaries were reduced by 1.9 percent, and administrator salaries were cut by 3 percent. Wash. State Senate Ways & Means Comm., 2011-13 Operating Budget, Statewide Summary & Agency Detail, Second Engrossed Substitute House Bill 1087, at 206 (June 3, 2011), http://leap.leg.wa.gov/leap/Budget/Detail/2011/SOAgencyDetail0603.pdf. The budget provided virtually no increase in funding for MSOCs. *Id.* at 205; *see also* LAWS OF 2011, 1st Spec. Sess., ch. 50, § 8. And the new transportation funding formula provided only $5 million more for student transportation than the legislature allocated during the previous biennium. 2011-13 Operating Budget Overview, *supra*, at 8.

¶81 Nonbasic education funding was likewise reduced in the 2011-13 operating budget. Funding under Initiative 728, for example, sustained cuts of $860 million, and a separate program for reducing K-4 class sizes lost $214 million.[19] *Id.*

## PROCEDURAL HISTORY

¶82 The McClearys and the Venemas are Washington State citizens, voters, and taxpayers who brought suit indi-

---

[19] For several years, the legislature has maintained a program for reducing K-4 class sizes that it does not consider part of "basic education." SHB 2776, however, made reductions in K-3 class sizes part of the State's funding obligations. Thus, while the legislature cut funding under the K-4 class-reduction program, SHB 2776 required the legislature to partially restore that funding for K-3 classrooms beginning in the highest-poverty schools.

vidually and on behalf of their children enrolled in the State's public school system. CP at 2769-70 (Findings of Fact (FF) 13-20). The Network for Excellence in Washington Schools (NEWS) is a statewide coalition of community groups, school districts, and education organizations. CP at 2770-81 (FF 21-97). Together, the McClearys, Venemas, and NEWS (collectively Plaintiffs) filed a petition for declaratory judgment on January 11, 2007, alleging that the State is violating article IX, section 1 of the Washington State Constitution by failing to adequately fund the K-12 school system. CP at 2768 (FF 10, 12); CP at 3 (petition); CP at 950 (amended petition).

¶83 The petition raises four main questions. First, "What is the correct interpretation of the words 'paramount,' 'ample,' and 'all' in Article IX, § 1 of the Washington State Constitution?" CP at 2767 (FF 4). Second, "What is the correct interpretation of the word 'education' in Article IX, § 1 of the Washington State Constitution?" *Id.* Third, "Is the Respondent State currently complying with its legal duty under [the] court's interpretation of the language in Article IX, § 1?" *Id.* Lastly, "If the Respondent State is not currently complying with its legal duty under [the] court's interpretation of Article IX, § 1, what (if any) Order should [the] court enter to uphold and enforce the State's legal duty?" *Id.*

¶84 Both parties moved for summary judgment. CP at 2768 (FF 11). Following extensive briefing, the trial court denied the cross motions. *Id.* The case eventually proceeded to a bench trial before Judge John P. Erlick of the King County Superior Court beginning on August 31, 2009. CP at 2766 (FF 1).

¶85 The court heard testimony from 28 fact and expert witnesses, with another 27 witnesses testifying via deposition. CP at 2946-47. Many of the witnesses were state officers, including former and current superintendents of public instruction, the longtime assistant superintendent of public instruction for school financial resources, the director of the State's Office of Financial Management, and

current and former legislators involved in K-12 finance reform. *See id.* Witnesses also included local school district superintendents, as well as Stephanie McCleary and Patricia Venema, both of whom testified about their children's experience in the public school system. *See id.* The State called several other witnesses, including nationally recognized experts in the area of school finance. *See id.* During the course of the testimony, over 500 exhibits came into evidence. CP at 2948-72. The trial concluded with closing arguments on November 25, 2009. CP at 2766 (FF 1).

¶86 On February 24, 2010, the trial court entered written findings and conclusions and final judgment in favor of Plaintiffs. CP at 2866-2971. The court found the State to be out of compliance with its constitutional duty, concluding that "[s]tate funding is not ample, it is not stable, and it is not dependable." CP at 2945. The judgment ordered the legislature to " 'proceed with real and measurable progress' " to

> (1) establish the actual cost of amply providing all Washington children with the education mandated by this court's interpretation of Article IX, § 1, and (2) establish how the Respondent State will fully fund that actual cost with stable and dependable State sources. The court has ordered that the State "must comply with the Constitutional mandate to provide stable and dependable funding for such costs", and that such funding "must be based as closely as reasonably practicable on the actual costs" of providing the education mandated by this court's interpretation of Article IX, § 1.

CP at 2867.

¶87 The State filed a notice of appeal with this court seeking direct review under RAP 4.2(a)(4). CP at 2973-75; State's Statement of Grounds for Direct Review at 10. Plaintiffs joined in the State's motion for direct review, asserting that the case presented "a fundamental and urgent issue of broad public import which requires a prompt and ultimate determination by this Court." Pls.' (1) Answer to Def. State's Statement of Grounds for Direct

Review and (2) Statement of Grounds for Direct Review (To the Extent Not Already Covered in the State's Statement) at 4. We agreed and accepted the case for direct review.

## ANALYSIS

I. Standard of Review

¶88 We review a trial court's challenged findings of fact for substantial evidence. *Sunnyside Valley Irrigation Dist. v. Dickie*, 149 Wn.2d 873, 879, 73 P.3d 369 (2003). "Substantial evidence" is "defined as a quantum of evidence sufficient to persuade a rational fair-minded person the premise is true." *Id.* (citing *Wenatchee Sportsmen Ass'n v. Chelan County*, 141 Wn.2d 169, 176, 4 P.3d 123 (2000)). We will not "disturb findings of fact supported by substantial evidence even if there is conflicting evidence." *Merriman v. Cokeley*, 168 Wn.2d 627, 631, 230 P.3d 162 (2010) (per curiam) (citing *In re Marriage of Lutz*, 74 Wn. App. 356, 370, 873 P.2d 566 (1994)). Unchallenged findings of fact are verities on appeal. *In re Estate of Jones*, 152 Wn.2d 1, 8, 93 P.3d 147 (2004) (citing *State v. Hill*, 123 Wn.2d 641, 644, 870 P.2d 313 (1994)). We review de novo the trial court's conclusions of law, including its interpretation of statutes and constitutional provisions. *See Sunnyside Valley*, 149 Wn.2d at 880.

II. Article IX, Section 1

¶89 Article IX, section 1 of the Washington State Constitution provides, "It is the paramount duty of the state to make ample provision for the education of all children residing within its borders, without distinction or preference on account of race, color, caste, or sex."

¶90 More than 30 years ago, we held that article IX, section 1 imposes a judicially enforceable affirmative duty on the State to make ample provision for the education of all children. *Seattle Sch. Dist.*, 90 Wn.2d at 520. We rejected the notion that section 1 is merely a preamble to article IX,

saying instead that "[i]t is declarative of a constitutionally imposed *duty*." *Id.* at 499. This is the first time since *Seattle School District* that we have reviewed a broad challenge to the State's alleged failure to comply with article IX, section 1.

¶91 Preliminarily, two aspects of the duty under article IX, section 1 stand out. First, by imposing the duty on "the sovereign body politic or governmental entity which comprises the 'State,' " article IX, section 1 contemplates a sharing of powers and responsibilities among all three branches of government as well as state subdivisions, including school districts. *Id.* at 512. At all levels of government the citizenry share in state sovereignty and responsibility.

¶92 The judiciary has the primary responsibility for interpreting article IX, section 1 to give it meaning and legal effect. We reiterated in *Seattle School District* the long-standing principle that " ' " " [i]t is emphatically the province and duty of the judicial department to say what the law is.' " ' " *Id.* at 496 (alteration in original) (quoting *In re Salary of Juvenile Director*, 87 Wn.2d 232, 241, 552 P.2d 163 (1976) (quoting *United States v. Nixon*, 418 U.S. 683, 703, 94 S. Ct. 3090, 41 L. Ed. 2d 1039 (1974) (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 176, 2 L. Ed. 60 (1803)))). This is so, we explained, " 'even when that interpretation serves as a check on the activities of another branch or is contrary to the view of the constitution taken by another branch.' " *Id.* (quoting *Juvenile Director*, 87 Wn.2d at 241); *see also id.* at 503 ("[T]he judiciary has the ultimate power and the duty to interpret, construe and give meaning to words, sections and articles of the constitution."); *id.* at 506 ("We cannot abdicate our judicial duty to interpret and construe Const. art. 9, §§ 1 and 2 . . . ."); *id.* at 510 (noting that the "traditional role accorded the judiciary to interpret and construe the constitution . . . involves no lack of respect due a coordinate branch of government"); *id.* at 515 ("[I]t is a function of the judiciary, not the legislature,

to interpret, construe and give substantive meaning to Const. art. 9, § 1."").

¶93 Consistent with this responsibility, we adopted broad guidelines defining the meaning of the words " 'ample,' " " 'provision,' " and " 'education' " under article IX, section 1. *Id.* at 515-16. We said, for example, that the State's constitutional duty to provide an "education"

> goes beyond mere reading, writing and arithmetic. It also embraces broad educational opportunities needed in the contemporary setting to equip our children for their role as citizens and as potential competitors in today's market as well as in the marketplace of ideas. Education plays a critical role in a free society. It must prepare our children to participate intelligently and effectively in our open political system to ensure that system's survival. It must prepare them to exercise their First Amendment freedoms both as sources and receivers of information; and, it must prepare them to be able to inquire, to study, to evaluate and to gain maturity and understanding. The constitutional right to have the State "make ample provision for the education of all [resident] children" would be hollow indeed if the possessor of the right could not compete adequately in our open political system, in the labor market, or in the marketplace of ideas.

*Id.* at 517-18 (citations omitted).

¶94 We explained that these broad guidelines "do not contemplate that the State must furnish 'total education' in the sense of *all* knowledge or the offering of *all* programs, subjects, or services which are attractive but only tangentially related to the central thrust of our guidelines." *Id.* at 519. Instead, the duty is "one to provide 'basic education' through a basic program of education." *Id.* Further, we noted that these educational concepts are not "fully definitive of the State's paramount duty" but that "the effective teaching and opportunities for learning these essential skills make up the *minimum* of the education that is constitutionally required." *Id.* at 518.

¶95 This court adopted broad educational concepts under article IX, section 1 to give the legislature "the greatest

possible latitude to participate in the full implementation of the constitutional mandate." *Id.* at 515. We explained that, "[w]hile the judiciary has the duty to construe and interpret the word 'education' by providing broad constitutional guidelines, the Legislature is obligated to give specific substantive content to the word and to the program it deems necessary to provide that 'education' within the broad guidelines." *Id.* at 518-19.

¶96 Thus, the legislature has the responsibility to augment the broad educational concepts under article IX, section 1 by providing the specific details of the constitutionally required "education." The legislature's "uniquely constituted fact-finding and opinion gathering processes" provide the best forum for addressing the difficult policy questions inherent in forming the details of an education system. *Id.* at 551 (Utter, J., concurring). We therefore concluded that, "[w]hile the Legislature must *act* pursuant to the constitutional mandate to discharge its duty, the general authority to select the *means* of discharging that duty should be left to the Legislature." *Id.* at 520.

¶97 The division of responsibilities between the judiciary and the legislature is evident from our refusal to establish specific guidelines for staffing ratios, salaries, and individualization of instruction. *Id.* at 519-20. These considerations, we noted, are better left to legislative discretion as informed by the broad educational concepts under article IX, section 1. *Id.*; *see also id.* at 505 (noting that "the legislature must . . . act within the confines of the judicial interpretation").

¶98 The delicate balancing of constitutional responsibilities under article IX, section 1 also led this court to adopt broad guidelines regarding the State's duty to fund the school system. We explained that "the State . . . has an affirmative paramount duty to make ample provision for funding the 'basic education' or basic program of education defined." *Id.* at 520. And we expressed the duty in broad terms, saying that the "funding must be accomplished by

means of dependable and regular tax sources." *Id.* But we did not outline the details of any particular funding structure, nor did we direct the legislature to infuse a specific level of resources into the school system.

¶99 The second aspect of the duty under article IX, section 1 that bears emphasis is the relationship between the State's *obligation* to provide an education and the corresponding *right* of Washington children to receive an education. We explained in *Seattle School District*:

> By imposing upon the State a *paramount duty* to make ample provision for the education of all children residing within the State's borders, the constitution has created a "duty" that is supreme, preeminent or dominant. Flowing from this constitutionally imposed "duty" is its jural correlative, a correspondent "right" permitting control of another's conduct. Therefore, all children residing within the borders of the State possess a "right," arising from the constitutionally imposed "duty" of the State, to have the State make ample provision for their education. Further, since the "duty" is characterized as *paramount* the correlative "right" has equal stature.

*Id.* at 511-12 (footnotes omitted).

¶100 We distinguished the right to an amply provided education under article IX, section 1, which the State cannot "invade[ ] or impair[ ]," from other "rights" such as freedom of religion or freedom of speech, which the State may impair "upon showing a compelling state interest." *Id.* at 513 n.13. We characterized the right under article IX, section 1 as a "true right," created by a "positive constitutional grant." *Id.* Other freedoms and privileges in the constitution, we explained, "exist because the constitution[ ] ha[s], in a negative sense, provided for noninterference with specific legal entities." *Id.*

¶101 This distinction between positive and negative constitutional rights is important because it informs the proper orientation for determining whether the State has complied with its article IX, section 1 duty in the present case. In the typical constitutional analysis, we ask whether the legisla-

ture or the executive has overstepped its authority under the constitution. The vast majority of constitutional provisions, particularly those set forth in the federal constitution's bill of rights and our constitution's declaration of rights, are framed as negative restrictions on government action. With respect to those rights, the role of the court is to police the outer limits of government power, relying on the constitutional enumeration of negative rights to set the boundaries. *See* Helen Hershkoff, *Positive Rights and State Constitutions: The Limits of Federal Rationality Review*, 112 HARV. L. REV. 1131, 1137 (1999).

¶102 This approach ultimately provides the wrong lens for analyzing positive constitutional rights, where the court is concerned not with whether the State has done too much, but with whether the State has done enough. Positive constitutional rights do not restrain government action; they require it. The typical inquiry whether the State has overstepped its bounds therefore does little to further the important normative goals expressed in positive rights provisions. Moreover, federal limits on judicial review such as the political question doctrine or rationality review are inappropriate. *See id.* at 1169; *Seattle Sch. Dist.*, 90 Wn.2d at 501-04. Instead, in a positive rights context we must ask whether the state action achieves or is reasonably likely to achieve "the constitutionally prescribed end." Hershkoff, *supra*, at 1137.

¶103 Given this " 'delicate exercise in constitutional interpretation,' " *Seattle School District*, 90 Wn.2d at 497 (quoting *Baker v. Carr*, 369 U.S. 186, 211, 82 S. Ct. 691, 7 L. Ed. 2d 663 (1962)), cases under article IX, section 1 have always proved difficult. If nothing else, they test the limits of judicial restraint and discretion by requiring the court to take a more active stance in ensuring that the State complies with its affirmative constitutional duty. *See, e.g.*, *Brown v. State*, 155 Wn.2d 254, 258, 119 P.3d 341 (2005) (expressing this court's "reluctan[ce]" to strike down the State's funding mechanism in *Seattle School District*). Not-

withstanding these concerns, "[w]e cannot abdicate our judicial duty to interpret and construe" article IX, section 1. *Seattle Sch. Dist.*, 90 Wn.2d at 506.

## III. Nature of the Duty under Article IX, Section 1

¶104 In order to determine whether the State has met its constitutional duty under article IX, section 1, we must know what that duty is. Plaintiffs' petition for declaratory judgment attempted to define the scope of the duty by asking the trial court to construe several words under article IX, section 1: "paramount," "all," "education," and "ample." The trial court defined each of these terms and the State assigned error to its definitions. We review the trial court's definitions for consistency with the constitutional text.

### *"Paramount" and "All"*

¶105 The trial court concluded that "paramount" means "having the highest rank that is superior to all others, having the rank that is preeminent, supreme, and more important to all others." CP at 2800 (Conclusions of Law (CL) 161). It declared that, in the context of article IX, section 1, "paramount" means the State must "amply provide for the education of all Washington children as the State's first and highest priority before any other State programs or operations." *Id.* The trial court interpreted "all" to mean " 'every' and 'each and every one of.' " CP at 2801 (CL 168). "All" children under article IX, section 1 therefore encompasses "each and every child since each will be a member of, and participant in, this State's democracy, society, and economy." *Id.* No child is excluded. *See id.*

¶106 In defining the word "paramount," the trial court was not writing on a blank slate. In *Seattle School District*, we defined "paramount" in the same terms, saying it meant "supreme, preeminent or dominant." 90 Wn.2d at 511. We therefore affirm the trial court's definition of "paramount." We also affirm its definition of "all," insofar as that defini-

tion provides broad constitutional guidelines for implementing article IX, section 1.

*"Education"*

¶107 Interpreting the word "education" under article IX, section 1 presents a greater challenge, as that term, more than any other, largely determines the scope of the State's duty.

¶108 The trial court concluded that "education" under article IX, section 1 "means the basic knowledge and skills needed to compete in today's economy and meaningfully participate in this State's democracy." CP at 2816 (CL 212). It declared that the current definition of the requisite knowledge and skills comes from three sources: the broad educational concepts articulated in *Seattle School District*, the four learning goals in ESHB 1209, and the EALRs. *Id.*

¶109 As discussed above, in *Seattle School District* we outlined broad guidelines for the word "education" in article IX, section 1. 90 Wn.2d at 517-18. We noted, however, that these broad guidelines are not "fully definitive of the State's paramount duty" but rather they constitute "the *minimum*" education that is constitutionally required. *Id.* at 518. Put differently, the educational concepts discussed in *Seattle School District* represent a constitutional floor below which the definition of "education" cannot fall. This court further directed the legislature to provide "specific substantive content to the word ['education'] and to the program it deems necessary to provide that 'education' within the broad guidelines" we had articulated. *Id.* at 518-19.

¶110 The legislature took a first step toward defining "education" in the Basic Education Act. In order to "comply with the requirements of Article IX, section 1," the legislature declared that the goal of the education system was "to provide students with the opportunity to achieve those skills which are generally recognized as requisite to learning," including the ability:

(1) To distinguish, interpret and make use of words, numbers and other symbols, including sound, colors, shapes and textures;

(2) To organize words and other symbols into acceptable verbal and nonverbal forms of expression, and numbers into their appropriate functions;

(3) To perform intellectual functions such as problem solving, decision making, goal setting, selecting, planning, predicting, experimenting, ordering and evaluating; and

(4) To use various muscles necessary for coordinating physical and mental functions.

LAWS OF 1977, 1st Spec. Sess. ch. 359, §§ 1, 2.

¶111 When the State transitioned from a seat-based education system to a performance-based system, the legislature revised the four learning goals under the Basic Education Act. ESHB 1209 declared that the new purpose of the Basic Education Act was "to provide students with the opportunity to become responsible citizens, to contribute to their own economic well-being and to that of their families and communities, and to enjoy productive and satisfying lives." LAWS OF 1993, ch. 336, § 101. To further this purpose, the school system was "to provide opportunities for all students to develop the knowledge and skills" necessary to:

(1) Read with comprehension, write with skill, and communicate effectively and responsibly in a variety of ways and settings;

(2) Know and apply the core concepts and principles of mathematics; social, physical, and life sciences; civics and history; geography; arts; and health and fitness;

(3) Think analytically, logically, and creatively, and to integrate experience and knowledge to form reasoned judgments and solve problems; and

(4) Understand the importance of work and how performance, effort, and decisions directly affect future career and educational opportunities.

Laws of 2007, ch. 400, § 1.[20]

¶112 The four learning goals in ESHB 1209 laid the foundation for developing specific academic learning requirements. Taking "each of the student learning goals" under ESHB 1209 as a guide, Laws of 1993, ch. 336, § 202(3)(a), EALRs were created in nine separate content areas, including reading, math, science, writing, communication, social studies, the arts, health and fitness, and educational technology. Ex. 144. The EALRs specify what "all students should know and be able to do at each grade level." *Id.*

¶113 We agree with the trial court that the legislature provided "specific substantive content to the word ['education']," *Seattle Sch. Dist.*, 90 Wn.2d at 518, by adopting the four learning goals in ESHB 1209 and developing the EALRs. Building on the educational concepts outlined in *Seattle School District*, ESHB 1209 and the EALRs identified the knowledge and skills specifically tailored to help students succeed as active citizens in contemporary society. In short, these measures together define a "basic

---

[20] The legislature updated the four learning goals under the Basic Education Act in 2007. Laws of 2007, ch. 400, § 1 (codified as RCW 28A.150.210). They currently state that the goal of the school system is to provide students with an opportunity to:

(1) Read with comprehension, write effectively, and communicate successfully in a variety of ways and settings and with a variety of audiences;

(2) Know and apply the core concepts and principles of mathematics; social, physical, and life sciences; civics and history, including different cultures and participation in representative government; geography; arts; and health and fitness;

(3) Think analytically, logically, and creatively, and to integrate technology literacy and fluency as well as different experiences and knowledge to form reasoned judgments and solve problems; and

(4) Understand the importance of work and finance and how performance, effort, and decisions directly affect future career and educational opportunities. RCW 28A.150.210.

education"—the substance of the constitutionally required "education" under article IX, section 1.[21]

¶114 The State contends that the four learning goals in ESHB 1209 and the EALRs do not help define the meaning of "education" under article IX, section 1, as that would require the legislature to go beyond its proper role and encroach on this court's duty to interpret the constitutional text. We agree with the State that this court has the final say on the meaning of the constitution. But we disagree that the legislature, as a coordinate branch of government, does not supply substance to the constitutionally required "education." Our discussion in *Seattle School District* makes clear that the legislature properly plays a key role in defining article IX, section 1—though this court remains the final arbiter on questions of interpretation. *Id.* at 496 (discussing the court's responsibility to ultimately say " 'what the law is' " even when that interpretation " 'is contrary to the view of the constitution taken by another branch' " (internal quotation marks omitted) (quoting *Juvenile Director*, 87 Wn.2d at 241)). Moreover, we took a cooperative approach in *Seattle School District*, stating that "the Legislature is obligated to give specific substantive content to the word ['education'] within the broad guidelines" we had outlined. *Id.* at 518-19. The legislature has done so.

¶115 The State further contends that construing "education" under article IX, section 1 in this manner will force the State to meet an untenable standard—requiring it to guarantee that all students actually achieve the learning goals listed in ESHB 1209 and master the EALRs. This argument fundamentally misconstrues the nature of the State's duty under article IX, section 1.

¶116 Nothing in article IX, section 1 requires the State to guarantee educational outcomes. Instead, in *Se-*

---

[21] For our purposes, the terms "education" under article IX, section 1 and "basic education" are synonymous.

*attle School District* we expressed the constitutionally required "education" in terms of "broad educational *opportunities*." *Id.* at 517 (emphasis added). Similarly, the legislature has always described the school system as providing an "opportunity" for successful student achievement. *See, e.g.*, Laws of 1977, 1st Ex. Sess., ch. 359, § 2 (Basic Education Act); Laws of 1993, ch. 336, § 101 (ESHB 1209). Even when the Basic Education Finance Task Force sat down to review the entire K-12 system and develop comprehensive reforms, it rejected any notion that the State could guarantee outcomes. 8 VRP (Sept. 14, 2009) at 1656. The chair of the task force expressed his view that "[w]e need to prove that we have provided the opportunity, and if taken advantage of, that it is realistic. But we can't guarantee success." *Id.* at 1659.

¶117 This conclusion reflects the inescapable truth that certain factors critical to a student's achievement are simply outside the State's control. As one state official testified at trial:

> We can control for a lot of factors, and we can control the level of funding.
>
> We can control the courses that are offered, the content that is delivered. We can control to a fairly high degree the quality of the instruction.
>
> We can say that, based on a lot of evidence, when those things are present at a quality level, that they will result in great student learning.
>
> We have all kinds of evidence of that.
>
> But we cannot guarantee that an individual student—even when provided all of that—will necessarily avail themselves of the opportunity—sort of the human variable that we, really, at some level can't control and we can't be responsible for.

13 VRP (Sept. 22, 2009) at 2798-99.

¶118 We hold that the "education" required under article IX, section 1 consists of the *opportunity* to obtain the knowledge and skills described in *Seattle School District*,

ESHB 1209, and the EALRs. It does not reflect a right to a guaranteed educational outcome.

¶119 In addition to the legislature's obligation to provide "substantive content to the word ['education']," we said in *Seattle School District* that the legislature must give substantive content to the "*program* it deems necessary to provide that 'education' within the broad guidelines." 90 Wn.2d at 518-19 (emphasis added). The legislature has done this by defining the program of basic education in terms of several offerings it considers necessary to provide the constitutionally required education to all children. At the time this case went to trial, the legislature's basic education program included (1) the education program outlined in the Basic Education Act, (2) special education, (3) some pupil transportation, (4) the learning assistance program (remediation), (5) transitional bilingual education, and (6) the institutional education program for juveniles in detention.[22] Ex. 192, at 4-5; Ex. 43, at 2.

¶120 While the legislature has long recognized these offerings as central to the basic education program, they are not etched in constitutional stone as part of the definition of "education." The legislature has an obligation to review the basic education program as the needs of students and the demands of society evolve. From time to time, the legislature will need to evaluate whether new offerings must be included in the basic education program. Likewise, the importance of certain programs or offerings may prove less compelling over time.

¶121 The legislature generally enjoys broad discretion in selecting the means of discharging its duty under article IX, section 1, including deciding which programs are necessary to deliver the constitutionally required "education." *See Seattle Sch. Dist.*, 90 Wn.2d at 520. But to ensure that the legislature exercises its authority within constitu-

---

[22] Although ESHB 2261 expanded the program of basic education to include, for example, all-day kindergarten and the highly capable program, these offerings were not implemented prior to trial.

tionally prescribed bounds, any reduction of programs or offerings from the basic education program must be accompanied by an educational policy rationale.[23] That is, the legislature may not eliminate an offering from the basic education program for reasons unrelated to educational policy, such as fiscal crisis or mere expediency. Rather, the legislature must show that a program it once considered central to providing basic education no longer serves the same educational purpose or should be replaced with a superior program or offering.

*"Ample"*

¶122 The second part of the legislature's duty under article IX, section 1 is to "make ample provision for funding the 'basic education' or basic program of education" it develops. *Id.* In *Seattle School District*, we adopted broad guidelines for the word "ample," saying it means " 'liberal, unrestrained, without parsimony, fully, sufficient.' " *Id.* at 515-16 (quoting trial court record); *see also id.* at 518 (saying that article IX, section 1 requires "as a first priority, fully sufficient funds" for the school system); *id.* at 537 (describing the requirement for "fully sufficient" funding).

¶123 The legislature's duty to make ample provision for funding the basic education program includes the requirement that funding "be accomplished by means of dependable and regular tax sources." *Id.* at 520; *see also Brown*, 155 Wn.2d at 258 ("regular and dependable tax sources"); *McGowan v. State*, 148 Wn.2d 278, 294, 60 P.3d 67 (2002) ("regular and dependable funding source"). We said in *Seattle School District* that the State cannot discharge its funding obligations by relying on local excess levies, as they are "neither dependable nor regular." 90 Wn.2d at 525. We also noted the inherent instability in a system that relies on

---

[23] The necessity of an educational policy rationale comes from Judge Doran's 1983 trial court ruling finding that state funding for "basic education" was inadequate. *See Brown*, 155 Wn.2d at 262 n.2. While we have never expressly endorsed the educational policy rationale, the State appears to consider Judge Doran's ruling binding.

the "assessed valuation of taxable real property within a district" to support "basic education." *Id.*

¶124 The trial court concluded that "ample" means "considerably more than just adequate or merely sufficient," CP at 2801 (CL 165), and that the State must fully fund "basic education" with "stable and dependable *State* sources," CP at 2837 (CL 273) (emphasis added); CP at 2830 (CL 255 (saying that the State cannot rely on "non-State funds" to finance "basic education")).

¶125 The State contends that the trial court erred by requiring basic education to be funded by state-level sources. In the State's view, the legislature can discharge its duty to make ample provision for funding education by authorizing nonstate tax sources that are otherwise "dependable and regular." *Seattle Sch. Dist.*, 90 Wn.2d at 520. Specifically, the State argues that the constitution allows it to make ample provision for education using federal funds as well as local funds not derived from excess levies.

¶126 We disagree. Our insistence on "dependable and regular tax sources" in *Seattle School District* focused appropriately on state-provided funding. *Id.* at 523. Contrary to the State's view, we rejected special excess levies as "dependable and regular" not only because they are subject to the whim of the electorate, but also because they are too variable insofar as levies depend on the assessed valuation of taxable real property at the local level. *Id.* at 525. This latter justification implicates both the equity and the adequacy of the K-12 funding system. Districts with high property values are able to raise more levy dollars than districts with low property values, thus affecting the equity of a statewide system. Conversely, property-poor districts, even if they maximize their local levy capacity, will often fall short of funding a constitutionally adequate education. All local-level funding, whether by levy or otherwise, suffers from this same infirmity. In short, the State's reliance on local dollars to support the basic education program fails to provide the "ample" funding article IX, section 1 requires.

¶127 Similarly, we find it difficult to characterize federal funding of certain education programs as a "regular and dependable tax source[ ]," *id.* at 523, for purposes of satisfying the State's obligation. Because federal dollars generally come with strings attached, the State may have little or no say on whether federal resources go toward the basic education program or some other program. Moreover, while federal funding is routed to school districts through the State's Office of Superintendent of Public Instruction (OSPI), it is in a sense pass-through money for local school districts. Still, the State maintains that, to the extent federal funding defrays the cost of certain offerings in the basic education program, the State may rely on that funding in discharging its duty under article IX, section 1. This argument is tenable, though we emphasize that the State retains the ultimate responsibility for fully funding its basic education program.

¶128 Having addressed the nature of the State's duty under article IX, section 1, we turn now to the question whether the State has complied with its constitutional obligation to amply provide for the education of all children.

IV. The State's Compliance with Its Article IX, Section 1 Duty

¶129 The trial court concluded that the State has failed to adequately fund the "education" required by article IX, section 1. Substantial evidence supports this conclusion. The evidence at trial showed that the State's now-abandoned basic education funding formulas did not correlate to the real cost of amply providing students with the constitutionally required "education." As a result, the State has consistently failed to provide adequate funding for the program of basic education, including funding for essential operational costs such as utilities and transportation. To fill this gap in funding, local districts have been forced to turn increasingly to excess levies, placing them on the same unstable financial foundation as the schools in *Seattle School District.*

*No Correlation between Funding Formulas and Basic Education*

¶130 The basic education funding formulas examined by the trial court did not correlate to the level of resources needed to provide all students with an opportunity to meet the State's education standards. This disconnect had its genesis in the legislature's failure to update the funding formulas after the State transitioned from a seat-based education system to a performance-based system in 1992. The legislature continued to fund schools using the formulas adopted in the Basic Education Act—formulas that were based on a snapshot of actual staffing levels and school district expenditures in the mid-1970s, not the level of resources needed to allow students to meet the new performance-based standards.

¶131 As the State phased in performance-based reforms, it became increasingly apparent that the old funding formulas were no longer valid. After identifying several flaws in the funding system, a joint legislative fiscal committee recommended in a 1995 report that the legislature conduct a comprehensive review of the funding formulas to determine whether they met current needs. Yet, no major reforms materialized.

¶132 By 2005, the lack of correlation between the funding formulas and the goals of the education system had become obvious. The Washington Learns final report noted that "[t]oday, the K-12 education system is still financed by the thirty-year old statutory formula of the Basic Education Act." Ex. 16, at 48. The report found that, despite the shift to a performance-based system, "the funding model for K-12 education has not been updated to reflect the new expectations and has not addressed the question of how to use resources most effectively in order to improve student outcomes." *Id.* Tellingly, the report concluded that "[s]table and significantly increased funding is required to support the evolving needs of our education system." *Id.* at 49.

¶133 The legislature commissioned the Basic Education Finance Task Force to come up with the details of a "new comprehensive K-12 finance formula or formulas that will provide Washington schools with stable and adequate funding as the expectations for the K-12 system continue to evolve." LAWS OF 2007, ch. 399, § 1. The task force did so, abandoning the old funding formulas in favor of a prototypical school model that, for the first time, prescribed a level of resources correlated to giving students an opportunity to achieve the state education standards. Ex. 124, at 7-13.

¶134 The testimony from several state officials at trial supported these findings. One long time state legislator and member of the Basic Education Finance Task Force opined that he could see no correlation between the funding formulas and the level of resources needed to provide students with an opportunity to gain the knowledge and skills outlined in ESHB 1209 and the EALRs. 6 VRP (Sept. 9, 2009) at 1262. The assistant director at the Washington State Institute for Public Policy testified that, based on his research for the Basic Education Finance Task Force, the funding formulas did not align with achieving student outcomes. 11 VRP (Sept. 17, 2009) at 2271-72. Another state legislator and member of the Basic Education Finance Task Force summed it up this way: "[T]here's no relationship between what we say we want a K-12 system to deliver and the mechanism that we use to determine the resources that we fund the system with." CP at 4412.

¶135 The State disputes these assessments, contending that the funding formulas were directly correlated to the resources needed to sustain its basic education program. The State points to the Basic Education Act, which declared from its inception that "[b]asic education shall be considered to be fully funded by those amounts of dollars appropriated by the legislature pursuant to" the funding formulas. LAWS OF 1977, 1st Ex. Sess., ch. 359, § 4. As the trial court found, this would mean that "full funding is whatever the

Legislature says it is," CP at 2805 (FF 180), thus allowing the State to maintain the appearance of fully funding the basic education program even though appropriations bear little resemblance to the actual level of resources needed to provide a "basic education."

¶136 We agree with the trial court's conclusion that the legislature's definition of full funding amounts to little more than a tautology. If the State's funding formulas provide only a portion of what it actually costs a school to pay its teachers, get kids to school, and keep the lights on, then the legislature cannot maintain that it is fully funding basic education through its funding formulas. Even assuming the funding formulas represented the actual costs of the basic education program when the legislature adopted them in the 1970s, the same is simply not true today.

*Failure To Fund the Actual Costs of the Basic Education Program*

¶137 Because the State's funding formulas did not correlate to the actual cost of maintaining its basic education program, state funding for "basic education" consistently fell below the mark.

¶138 The Washington Learns report recognized that funding levels were inadequate, and it called for "[s]table and *significantly increased funding* . . . to support the evolving needs of our education system." Ex. 16, at 49 (emphasis added). The report concluded by expressing the State's commitment "to develop a ten-year implementation strategy for stable and *significantly increased funding* to support a world-class, learner-focused, seamless education system for Washington." *Id.* at 50 (emphasis added). The initial report from the Quality Education Council likewise found that "[f]unding studies have already confirmed that our state pays for too few instructional and operating staff, that our salary allocations are no longer consistent with market requirements, and that operating costs are woefully

underfunded." CP at 2819 (FF 223).[24] Similarly, a presentation by OSPI entitled "K-12 Finances: Depth, Breadth, and Causes of a Looming Finance Crisis" concluded that "[s]tate [u]nderfunding is [n]ot [d]isputed," and "Basic Education shortfalls are so large, fixes will take many years." Ex. 67, at 39, 42.

¶139 During trial, the evidence highlighted three major areas of underfunding: basic operational costs, or NERCs; student to/from transportation; and staff salaries and benefits.

¶140 NERCs (which correlate to MSOCs under recent labels) represented items such as instructional supplies, textbooks, equipment, utilities, technology, and insurance. Ex. 330, at 8. The State allocated a certain dollar amount for NERCs for each certificated staff person in the school. The amount of money schools received was pinned to the actual cost of NERCs in the mid 1970s, adjusted for inflation. CP at 338; 19 VRP (Oct. 8, 2009) at 4317.

¶141 The evidence of NERCs underfunding at trial was compelling. OSPI conducted a survey of 71 school districts to determine the actual cost of "basic education" related NERCs during the 2006-07 school year. Ex. 68, at 36. The results revealed that the State underfunded NERCs by approximately $500 million per biennium.[25] *Id.*; CP at 4517. The data broke down the funding for each NERCs component, showing, for example, that the State provided

---

[24] The State assigns error to the trial court's reliance on the QEC's report because the report was issued after the trial concluded. Br. of Appellant at 3 n.1. Yet the State itself relies on information and documents that were produced in the last several months to illustrate the changing landscape of the K-12 system. *See, e.g.,* State's Br. in Opp'n to Amici at 7 n.2, 9-10 nn.4-5, 18 n.7. We may properly consider the report. WASH. OFFICE OF SUPERINTENDENT OF PUB. INSTRUCTION, QUALITY EDUCATION COUNCIL, INITIAL REPORT TO THE GOVERNOR & LEGISLATURE (Jan. 15, 2011), *available at* http://www.k12.wa.us/qec/default.aspx.

[25] The State argues that this survey did not provide evidence of underfunding because it represented a "wish list," as opposed to actual expenditures for NERCs. But documents from OSPI cast the data in terms of actual costs to school districts. Ex. 68, at 36; Ex. 67, at 20; Ex. 71, at 35-36. And the testimony from state officials confirmed that the survey represented actual NERCs expenditures. 7 VRP (Sept. 10, 2009) at 1482; 23 VRP (Oct. 15, 2009) at 5153-54.

$115 for utilities per student, while the actual cost of utilities was $252 per student. Ex. 68, at 36. Similarly, the State provided only $42 per student for curriculum, which was just enough to sustain an 18-year replacement cycle. *Id.* As a result, only five percent of K-5 students could obtain an up-to-date math curriculum from the State menu. Ex. 695, at 24.

¶142 Massive underfunding of NERCs continued during the 2007-08 school year. Ex. 616, at 1. OSPI data showed that nearly 20 percent of school districts spent 100 percent of their NERCs allocation on utilities and insurance alone. *See id.* at 2. This meant that approximately 46 school districts, with some 17,000 students, had no money for textbooks or technology after paying for utilities and insurance. Ex. 695, at 24.

¶143 The testimony from several state officials confirmed that state funding for NERCs did not correspond to actual costs. Jennifer Priddy, the assistant superintendent of financial resources with OSPI,[26] testified that NERCs were "woefully underfunded." 20 VRP (Oct. 12, 2009) at 4536. She explained that this was due, in part, to the fact that the inflation adjustment for utilities and insurance did not reflect the actual inflation rate for those items. 7 VRP (Sept. 10, 2009) at 1455. The senior fiscal analyst for the house of representatives likewise testified that the state allocation for NERCs was less than the actual expenditure for NERCs by school districts. 18 VRP (Oct. 1, 2009) at 3995-96. The senior budget analyst for K-12 education at the Office of Financial Management added that the State funded only about half of the actual cost of NERCs. 23 VRP (Oct. 15, 2009) at 5116.

¶144 The Basic Education Finance Task Force also took note of the significant disparity between state allocations

---

[26] The chair of the Basic Education Finance Task Force said that Jennifer Priddy "would be, if not the foremost expert and most knowledgeable individual on state education finance matters, she would certainly be among the most—those with the most expertise and knowledge." 8 VRP (Sept. 14, 2009) at 1582.

for NERCs and the actual cost of NERCs to school districts. In its final report, the task force recommended that the legislature fill the gap by increasing the NERCs allocation from $468 per student to $1,086 per student. *Compare* Ex. 124, at 10, *with* Ex. 68, at 35.

¶145 Apart from NERCs, state funding also consistently fell short in the area of student transportation.[27] A 2006 report by the Joint Legislative Audit and Review Committee revealed that the State underfunded to/from student transportation by between $93 and $114 million per year. Ex. 357 (relying on data from the 2004-05 school year). The report concluded that the transportation funding formula did not reflect actual to/from costs, as the legislature had not updated the formula since its adoption in the early 1980s.[28] *Id.* OSPI data also showed that underfunding for student transportation persisted in the range of $125 million to $127 million during the 2006-07 and 2007-08 school years. Ex. 68, at 53; Ex. 1579, at 80.

¶146 According to testimony at trial, one problem with the transportation formula was its failure to properly account for increases in fuel prices. 7 VRP (Sept. 10, 2009) at 1465-66. While the State Department of Transportation used a particular metric to forecast increases in fuel costs to sustain its basic operations, the transportation funding formula did not rely on any similar metric. *Id.* As a result, underfunding for fuel costs alone totaled approximately $49 million over a period of several years. Ex. 359, at 1.

¶147 Substantial evidence at trial also showed that the State consistently underfunded staff salaries and benefits.

---

[27] Trial testimony showed that state underfunding of student transportation had a tangible effect on student safety. One superintendent testified that, due to budget cuts, the district had to reduce transportation for students who lived within one mile of their schools. 17 VRP (Sept. 30, 2009) at 3728-29. During trial, an elementary-age student in the district who otherwise would have been transported by bus, walked to school across a highway and was struck by a car. *Id.* at 3729.

[28] The transportation funding formula was separate from the general apportionment funding formula, but it suffered from the same deficiencies in terms of its lack of correlation to true costs.

Testimony revealed that the State allocation for salaries and benefits fell far short of the actual cost of recruiting and retaining competent teachers, administrators, and staff. 3 VRP (Sept. 2, 2009) at 697; 8 VRP (Sept. 14, 2009) at 1586-87; 9 VRP (Sept. 15, 2009) at 1815; 18 VRP (Oct. 1, 2009) at 3995-96. OSPI data confirmed this testimony, showing that on average, the state allocation for instructional staff was approximately $8,000 less than what districts actually paid. Ex. 67, at 8. The shortfall for administrators was even more drastic, representing on average approximately $40,000 less than actual expenditures, which left local districts to subsidize classified staff and administrative salaries by roughly $366 million per year.[29] *Id.* at 10; *see also* 3 VRP (Sept. 2, 2009) at 697 (superintendent of Colville School District testifying, "I've tried to get principals to be a principal for what the state gives us but . . . I can't get anybody to do that . . . . [I]t's nowhere close to what the market value is for our principal[s], not even— it's ridiculous").

¶148 Some of the difference between actual salaries and state allocations represented permissible incentive pay that went toward nonbasic education related tasks. But OSPI data highlighted that "districts pay for some supplemental salaries that are likely a basic education responsibility." Ex. 68, at 29. A former state superintendent of public instruction testified that school districts rely heavily on local levies to fund teachers' salaries. CP at 3261. The chair of the Basic Education Finance Task Force described it this way at trial:

---

[29] This is the second time in recent years that we have noted that state funding does not approach the true cost of paying salaries for administrators and other staff. In *Federal Way School District*, 167 Wn.2d at 522, we recognized that the Federal Way School District received on average approximately $58,000 from the State to pay its administrators. We said, however, that "[t]hese figures have no correlation to the real cost of hiring administrators; the average Federal Way School District administrator makes $94,486." *Id.* at 522 n.11. Because that case was framed as a challenge to statewide *disparity* in salaries, as opposed to general *adequacy* of state funding of salaries, we did not pass on whether the State's underfunding violated article IX, section 1. *Id.* at 527-28.

[Task Force Chair]: For several years, back in the late '70s and earlier '80s, the state provided very modest salary increases for teachers. Teachers and local school officials argued that there should be increased opportunities for salary increases for many school districts . . . and the legislature enacted legislation called TRI, which stands for Time, Responsibilities, and Incentives . . . . [W]hat it allowed and authorized was for local school districts to use locally derived revenues from local levy property taxes for salary increases. Ostensively [sic— ostensibly] associated with and justified by increased time on task, additional responsibilities, or the rather ambiguous, an incentive to improve performance.

And language was inserted which asserted that none of these expenditures can be used for basic education.

[Plaintiffs' Counsel]: Now, when you say basic education, you mean the basic education program?

[Task Force Chair]: Correct. And it's disingenuous because it does. There is no separation de facto. There may be disure [sic—de jure] but de facto—*that money is all just salary increases*, and I would contend that if you had testimony from teachers from all across the state who would get paid different salaries, based upon TRI in many instances, that their descriptions of their job duties, time, and incentives would be identical.

8 VRP (Sept. 14, 2009) at 1589-91 (emphasis added).

¶149 In sum, the legislature devised a basic education program to provide the constitutionally required "education" under article IX, section 1. The program defined the resources and offerings the legislature believed were necessary to give all students an opportunity to meet state standards. Yet substantial evidence shows that state allocations have consistently fallen short of the actual cost of implementing the basic education program. By the legislature's own terms, it has not met its duty to make ample provision for "basic education."

*Funding the Basic Education Program with Local Levies*

¶150 The shortfall in state funding forced school districts to increasingly rely on local levies to meet the actual

costs of the basic education program. The chair of the State Board of Education testified that as actual costs outpaced state allocations, local districts relied more and more on levy funds for core operational expenses. 13 VRP (Sept. 22, 2009) at 2863, 2933-34. One superintendent testified that his district relied heavily on local levies just to keep its doors open, calling the levy funds a "lifeline." 4 VRP (Sept. 3, 2009) at 748, 780; *see also* 2 VRP (Sept. 1, 2009) at 266 (another superintendent testifying that if his district had to rely only on state funding, "that would result in us closing the doors").

¶151 Similarly, an OSPI presentation to the Basic Education Finance Task Force revealed that while "Local Funds [were] commonly thought to employ 'enhancement' staff and programs[,] [i]n actuality, Local Funds cover[ed] major shortfalls." Ex. 68, at 9; *see also* 5 VRP (Sept. 8, 2009) at 1190 (state legislator testifying that "[a]ccording to OSPI, we . . . provid[ed] out of levies basic education dollars to supplement to the tune of about 1.3 billion [dollars]").

¶152 To counter Plaintiffs' evidence that schools relied heavily on local levies to fill the gap in funding for the basic education program, the State called Calvin Brodie, the director of School Apportionment and Financial Services for OSPI. Mr. Brodie testified that the annual accounting record for school districts, the F-196 form, did not reveal whether schools actually used local funds for basic education program expenditures, as the form did not track which funds went to which programs. 19 VRP (Oct. 8, 2009) at 4210, 4217, 4258, 4260. Still, Mr. Brodie admitted that, apart from the F-196 form, he believed that local funds were used to fund activities that arguably fell under the State's responsibility. *Id.* at 4351. Another OSPI official testified that, even though the accounting records did not detail which funds went to which programs, it was generally known that schools used local funds for basic education program expenditures. 20 VRP (Oct. 12, 2009) at 4541.

¶153 The fact that local levy funds have been at least in part supporting the basic education program is

inescapable. As of 2010, all school districts have a levy lid of 28 percent, and 90 grandfathered districts maintain levy lids as high as 38 percent. LAWS OF 2010, ch. 237. The trial evidence does not show that increases in local funding went strictly to providing "enhancements" to "basic education." Instead, the increase in school districts' levy capacity over the years reflects the growing need to fill the gap between state allocations and the actual cost of providing the program of basic education.[30] Reliance on levy funding to finance basic education was unconstitutional 30 years ago in *Seattle School District*, and it is unconstitutional now.

¶154 After extensive review over many years, state task forces and committees have concluded that the K-12 funding system is broken. The legislature itself abandoned its longtime funding model effective September 1, 2011. Following an eight-week bench trial, the trial court concluded that the State has failed to meet its constitutional obligations. Substantial evidence confirms that the State's funding system neither achieved nor was reasonably likely to achieve the constitutionally prescribed ends under article IX, section 1. We affirm the trial court's declaratory ruling and hold that the State has not complied with its article IX, section 1 duty to make ample provision for the education of all children in Washington.

¶155 We do not believe this conclusion comes as a surprise. Rather, the evidence in this case confirms what many educational experts and observers have long recognized: fundamental reforms are needed for Washington to meets its constitutional obligation to its students. Pouring more money into an outmoded system will not succeed. We

---

[30] Recent data from the Levy and Local Effort Assistance Technical Working Group confirms that levy dollars increasingly make up for shortfalls in the State's allocation for basic education. The working group's report estimates that school districts expend 54 percent of their levy money to fund salaries and benefits after receiving the state allocation, another 21 percent to make up for shortfalls in NERCs allocations, and 6 percent to backfill student transportation. WASH. OFFICE OF FIN. MGMT., FINAL REPORT, LEVY AND LOCAL EFFORT ASSISTANCE TECHNICAL WORKING GROUP 41-43 (July 12, 2011), *available at* http://www.ofm.wa.gov/levy/report/report.pdf.

turn then to the more difficult issue: what remedy this court should employ to ensure that the State complies with its article IX, section 1 duty.

## V. Remedy

¶156 Finding the appropriate remedy in cases involving article IX, section 1 has always proved elusive. Part of the reason is that things do not stand still while the litigation progresses. Here, for instance, Plaintiffs initially wanted the State to conduct a study to determine the actual cost of funding basic education. Shortly after the litigation began, the State, through the Basic Education Finance Task Force, moved forward with a comprehensive review of K-12 finance. By the time of trial, the legislature had implemented many of the task force's findings with the passage of ESHB 2261. The State took the position that the new legislation essentially mooted Plaintiffs' demands. The trial court disagreed and ordered the legislature to determine the actual cost of basic education and to provide the requisite funding. Then, while the appeal was pending in this court, but before oral argument, the legislature passed an appropriations bill that failed to provide full funding for ESHB 2261. *See, e.g.*, LAWS OF 2011, ch. 50, § 8 (failing to provide enhanced funding for MSOCs). At this juncture, neither side is satisfied with the trial court's remedy—the State believes it goes too far, and Plaintiffs believe it does not go far enough.

¶157 The other reason that the remedy question proves elusive has to do with the delicate balancing of powers and responsibilities among coordinate branches of government. This court is appropriately sensitive to the legislature's role in reforming and funding education, and we must proceed cautiously. At the same time, the constitution requires the judiciary to determine compliance with article IX, section 1. In *Seattle School District*, we deferred to ongoing legislative reforms and simply declared the funding system inadequate. Though Judge Doran had retained jurisdiction to

monitor the progress of reforms, this court rejected that part of his order. *Seattle Sch. Dist.*, 90 Wn.2d at 538-39. The immediate result was another lawsuit, ensuing litigation, and a second trial court ruling in which Judge Doran outlined a detailed enforcement plan. The long term result was 30 years of an education system that fell short of the promise of article IX, section 1 and that ultimately produced this lawsuit. What we have learned from experience is that this court cannot stand on the sidelines and hope the State meets its constitutional mandate to amply fund education. Article IX, section 1 is a mandate, not to a single branch of government, but to the entire state. *Id.* at 512. We will not abdicate our judicial role.

¶158 That said, we cannot endorse the trial court's remedy. It is problematic insofar as it gives too little weight to the reform efforts initiated under ESHB 2261. In the trial court's view, ESHB 2261 fell short of providing a solution to the funding system's deficiencies because it lacked specifics and it failed to bind future legislatures to provide full funding for basic education. CP at 2836-37 (CL 272-74). To address these concerns, the trial court ordered the legislature "(1) to establish the actual cost of amply providing all Washington children with the education mandated by this court's interpretation of Article IX, § 1, and (2) to establish how the Respondent State will fully fund that actual cost with stable and dependable State sources." CP at 2837-38 (CL 275). The court further directed the legislature to proceed "with real and measurable progress" in accomplishing this task. *Id.*

¶159 Ordering the legislature to do yet another cost study crosses the line from ensuring compliance with article IX, section 1 into dictating the precise means by which the State must discharge its duty. This fails to respect the division of constitutional responsibilities outlined in *Seattle School District*, where we said that "[w]hile the Legislature must *act* pursuant to the constitutional mandate to discharge its duty, the general authority to select the *means* of

discharging that duty should be left to the Legislature." 90 Wn.2d at 520.

¶160 Moreover, ordering another cost study would in large part repeat the significant efforts that went into ESHB 2261. The trial court's order requires the State to determine the actual cost of amply providing an "education" under article IX, section 1. Yet ESHB 2261 already attempts to do just that. The prototypical school model is the product of a specific type of cost study called an evidence-based approach to funding adequacy. Ex. 364, at 2-3. The evidence-based approach looks to literature in the research community on interventions that have an impact on student achievement and then attaches a dollar figure to those interventions. *Id.*; 21 VRP (Oct. 13, 2009) at 4575-76. The prototypical school model for Washington was originally set forth in the Picus and Odden report, which the Basic Education Finance Task Force relied on in making its recommendations to the legislature. The task force's recommendations in turn provided the framework for the funding model under ESHB 2261.

¶161 During closing arguments, the trial court expressed its concern that ordering another cost study would replicate the legislature's efforts with ESHB 2261:

> Court: All right. So, if I state that ample means more than adequate, paramount means superior to all other, and all means all, each and every one, and it's the constitutional duty of the state to make that provision, and I'm going to order a study to create a program that will effectuate that and costs it out, all you're going to get, it seems to me, is another task force view on what it takes to make that provision.
>
> In other words, if you look at all these studies, they each think that they're making provision for ample, ample provision for education. Washington Learns thinks that. Full Funding Coalition[31] thought that. The –
>
> [Plaintiffs' counsel]: Picus and Odden.

---

[31] The Full Funding Coalition was a group of educational organizations in Washington that submitted a proposal to the Basic Education Finance Task Force on reforming the K-12 finance system. The proposal was a variant of the

25 VRP (Oct. 21, 2009) at 5451-52. At another point, the trial court returned to its concern: "So this new task force is created and they're going to say what do we include? Where should we start? And probably they're going to start with something of a prototype school . . . ." *Id.* at 5458. Despite Judge Erlick's apparent unease, he ultimately acceded to Plaintiffs' proposed remedy.

¶162 Much has happened since Judge Erlick entered his enforcement order. As we consider the remedy question today, we have the benefit of seeing the wheels turn under ESHB 2261. It would be a mistake to disregard that progress now and require the legislature to return to the drawing board.

¶163 This is especially true given that the legislature has already developed a promising reform program in ESHB 2261. Several state officials testified that full implementation and funding for ESHB 2261 will remedy the deficiencies in the prior funding system. The chair of the State Board of Education, for example, expressed her opinion that full implementation of ESHB 2261 would go a long way toward giving students an opportunity to meet the State's academic learning goals. 13 VRP (Sept. 22, 2009) at 2859, 2934. Similarly, a legislator who served on the education committee for nine years and was a member of the Basic Education Finance Task Force, testified that the reason the legislature passed ESHB 2261 was to remedy the constitutional infirmities in the K-12 funding system. CP at 4462. When current Superintendent of Public Instruction Randy Dorn was asked if ESHB 2261 would meet the State's constitutional duty when fully implemented in 2018, he responded:

> If the legislature fulfills its obligation in that law and also finds the funding source. Okay, I think that's key. I don't think

---

prototypical school model derived from an independent study titled the "Washington Adequacy Funding Study." CP at 3538 (citing EDUC. POLICY IMPROVEMENT CTR., WASHINGTON ADEQUACY FUNDING STUDY (Jan. 2007)).

you can do it out of existing systems. So they would have to find a funding source. Then I believe you could get to adequate or ample funding of education, but they also have to find a funding source for revenue to go to education.

CP at 4522.[32]

¶164 Given the comprehensive reforms projected under ESHB 2261, the State argues that we should do no more than await the legislature's implementation schedule. While we are sensitive to the legislature's role in reforming education, such an approach would be unacceptable. As a coequal branch of state government we cannot ignore our constitutional responsibility to ensure compliance with article IX, section 1.

¶165 Recent cuts to K-12 funding confirm that too much deference may set the stage for another major lawsuit challenging the legislature's failure to adhere to its own implementation schedule. For example, SHB 2776 implemented many of the details of ESHB 2261's prototypical school model, including an increase in state dollars for MSOCs beginning in the 2011-13 biennium. Despite the apparent commitment to begin phasing in increased state funding, the operating budget for the 2011-13 biennium left state spending for MSOCs essentially flat. Pls.' Answer to Amicus League of Education Voters, App. A at 205. The legislature's failure to fund promised reforms perpetuates the $500 million biennial shortfall in MSOC allocations, requiring school districts to continue to rely on levy funding for basic education costs. Schools will likewise be forced to turn to levy funding to cushion the budget's 1.9 percent cut to teacher salaries and 3.0 percent cut to administrator salaries.

---

[32] Another legislator involved in the passage of ESHB 2261 was less optimistic about the bill's prospect for fixing the funding system, primarily because it lacked details for increased funding and resources. 6 VRP (Sept. 9, 2009) at 1388-91. This view was expressed prior to the passage of SHB 2776, which filled in some of the funding details.

¶166 Although the 2011-13 operating budget did fund several other reforms under SHB 2776, timely implementation remains uncertain. For instance, SHB 2776 called for continued phasing in of all-day kindergarten, with statewide implementation to be achieved by 2018. The operating budget provided some funding for the all-day kindergarten program, but it expanded the program to only 21 percent of school districts in 2011-12 and to only 22 percent of school districts in 2012-13. Needless to say, a one-percent per year increase does not put the State on the path to statewide implementation of all-day kindergarten by the 2017-18 school year. *Id.* at 9 (noting that, at the current pace, the State would not fund all-day kindergarten for all eligible students until the 2090-91 school year).

¶167 Similarly, SHB 2776 required increased funding for continued reductions in K-3 class sizes, with class sizes to be reduced to 17 students by the 2017-18 school year. The operating budget provided $33.6 million in funding to reduce the class sizes in K-3, but at the same time it cut $214 million from a separate "nonbasic education" program that went to reducing class sizes in K-4, resulting in a significant net loss in K-3 class reductions. Further, the budget's $5 million enhancement to transportation will barely make a dent in what has consistently been a $100 million annual shortfall.

¶168 This court cannot idly stand by as the legislature makes unfulfilled promises for reform. We therefore reject as a viable remedy the State's invitation for the court simply to defer to the legislature's implementation of ESHB 2261. At the same time, we recognize that Plaintiffs' proposal to set an absolute deadline for compliance in the next year is unrealistic. The changes that have taken place during the pendency of this case illustrate that any firm deadline will, of necessity, be moved.

¶169 A better way forward is for the judiciary to retain jurisdiction over this case to monitor implementation of the reforms under ESHB 2261, and more generally, the

State's compliance with its paramount duty. This option strikes the appropriate balance between deferring to the legislature to determine the precise means for discharging its article IX, section 1 duty, while also recognizing this court's constitutional obligation. This approach also has the benefit of fostering dialogue and cooperation between coordinate branches of state government in facilitating the constitutionally required reforms. The court below did not evaluate options for retaining jurisdiction, and the parties have not had an opportunity to address the issue. Our prior experience and the experience of other courts suggests there are numerous options, including retaining jurisdiction in the trial court, retaining jurisdiction in this court, or perhaps appointing a special master or oversight entity.[33] While we recognize that the issue is complex and no option may prove wholly satisfactory, this is not a reason for the judiciary to throw up its hands and offer no remedy at all. Ultimately, it is our responsibility to hold the State accountable to meet its constitutional duty under article IX, section 1. Accordingly, we direct the parties to provide further briefing to this court addressing the preferred method for retaining jurisdiction.

## CONCLUSION

¶170 Article IX, section 1 of the Washington State Constitution makes it the paramount duty of the State to amply provide for the education of all children within its borders. This duty requires the State to provide an opportunity for every child to gain the knowledge and skills outlined in *Seattle School District*, ESHB 1209, and the EALRs. The legislature must develop a basic education program geared toward delivering the constitutionally required education,

---

[33] As noted, Judge Doran initially retained jurisdiction at the trial court level in *Seattle School District*. After this court reversed that decision, and a second lawsuit was brought, Judge Doran's trial court order served for many years as the guidepost for measuring education reforms.

and it must fully fund that program through regular and dependable tax sources.

¶171 The State has failed to meet its duty under article IX, section 1 by consistently providing school districts with a level of resources that falls short of the actual costs of the basic education program. The legislature recently enacted sweeping reforms to remedy the deficiencies in the funding system, and it is currently making progress toward phasing in those reforms. We defer to the legislature's chosen means of discharging its article IX, section 1 duty, but the judiciary will retain jurisdiction over the case to help ensure progress in the State's plan to fully implement education reforms by 2018. We direct the parties to provide further briefing to this court addressing the preferred method for retaining jurisdiction. The clerk's office will set an appropriate briefing schedule.

¶172 A noted scholar in the area of school-finance litigation has observed that success depends on "continued vigilance on the part of courts." James E. Ryan, *Standards, Testing, and School Finance Litigation*, 86 TEX. L. REV. 1223, 1260 (2008). This court intends to remain vigilant in fulfilling the State's constitutional responsibility under article IX, section 1.

C. JOHNSON, CHAMBERS, OWENS, FAIRHURST, and WIGGINS, JJ., and ALEXANDER, J. PRO TEM., concur.

¶173 MADSEN, C.J. (concurring/dissenting) — I agree with Justice Stephens' articulation of the State's duty to fund education under article IX, section 1 of the Washington Constitution and the conclusion that the current system is not operating at its constitutionally mandated levels. However, I disagree with the majority that the judiciary should retain control over this case.

¶174 As we noted in resolving prior school funding challenges, our "traditional judicial function[ ]" is to inter-

pret article IX, section 1 of our state constitution and to determine whether our state is meeting its constitutional responsibility. *Seattle Sch. Dist. No. 1 v. State*, 90 Wn.2d 476, 508, 585 P.2d 71 (1978). In the current case, we have defined "education," "paramount," "all," and "ample" and ordered the State to carry out its constitutional duty. We have done our job; now we must defer to the legislature for implementation.

¶175 Indeed, there is precedent for judicial deference to the legislature with regard to the execution of article IX, section 1. In *Seattle School District*, we held that once the constitutional ends have been defined by the courts, the means of compliance are firmly within the realm of the legislative power. *Id.* at 520 ("[w]hile the Legislature must *act* pursuant to the constitutional mandate to discharge its duty, the general authority to select the *means* of discharging that duty should be left to the Legislature"). We described the trial court's decision to retain jurisdiction in that case as "inconsistent" with the assumption that the legislature, as a sworn "constitutional body, would comply with the constitutional mandate" under article IX, section 1. *Id.* at 538-39. Although the majority is ostensibly "defer[ing] to the legislature's chosen means of discharging its article IX, section 1 duty," it has taken the extraordinary step of "retain[ing] jurisdiction over [a] case to help facilitate progress in the State's plan to fully implement the reforms by 2018." Majority at 484.

¶176 The majority claims that by retaining jurisdiction, the judiciary will "facilitate progress" within the legislative branch, but it fails to discuss how it will fulfill such a role. Generally, in cases where a court retains jurisdiction, the court sets forth clear benchmarks and ascertainable standards against which to measure compliance. For example, the federal courts' supervision of school desegregation used identifiable factors to determine if a school district had achieved its mandate. To aid the federal district courts in implementing their desegregation order, the United States

Supreme Court identified six factors that "are a measure of the racial identifiability of schools in a system that is not in compliance with *Brown* [*v. Board of Education*, 347 U.S. 483, 74 S. Ct. 686, 98 L. Ed. 873 (1954)]." *Freeman v. Pitts*, 503 U.S. 467, 486, 112 S. Ct. 1430, 118 L. Ed. 2d 108 (1992) (citing *Green v. County Sch. Bd.*, 391 U.S. 430, 435, 88 S. Ct. 1689, 20 L. Ed. 2d 716 (1968)). The factors constituting specific aspects of a school system are the assignment of students by race, physical facilities, extracurricular activities, faculty and staff assignments, transportation, and resource allocation. *See Green*, 391 U.S. at 436; *Freeman*, 503 U.S. at 497-98. District courts then weighed the effectiveness of a school district's desegregation plans under these factors and directed action to remedy specific areas of noncompliance. *See Freeman*, 503 U.S. at 485.

¶177 In contrast, the majority here fails to define the desired outcomes or to provide criteria or benchmarks against which a court, special master, or other oversight entity can measure the legislature's compliance. In fact, as in *Seattle School District*, the majority has *declined* to identify specific requirements or goals, such as required deployment of staff, student to staff ratios, or minimum employee salaries, which would objectively indicate whether the State has complied with its constitutional duties. *See* majority at 541-46; *Seattle Sch. Dist.*, 90 Wn.2d at 520-21. In addition, the majority vacated the trial court's order to the legislature to " 'establish the actual cost of amply providing all Washington children with' " the constitutionally mandated education and " 'establish how the Respondent State will fully fund that actual cost.' " Majority at 541. Without clear, identified goals, judicial supervision will be unhelpful, can assure no compliance and, at worst, will be obstructive.

¶178 But, in any event, I do not believe this court should attempt to establish goals or benchmarks for the legislature to meet. Rather, as we held in *Seattle School District*, it is the legislature's duty to define what constitutes basic

education and how to adequately fund education at that level. Adopting specific standards or guidelines for defining and funding basic education is a legislative responsibility; it is not a judicial function.

¶179 The sentiment behind the majority's decision is understandable. Thirty years after our decision in *Seattle School District* the legislature has failed to adequately fund basic education. Nevertheless, the majority correctly identifies ESHB 2261 as "promising reform." Majority at 543. This court should exercise judicial restraint and permit the legislature to implement the statute without the burden to confer and report to the judiciary at every step.

¶180 I believe the majority's largely symbolic decision disturbs the comity enjoyed between the judiciary and the legislative branch without providing any effective guidance to the legislature. To decline to retain jurisdiction is not an "abdication" of our responsibility; rather, it is recognition of the limits of our institution's role and competency. If the legislature fails to carry out its constitutional duty as directed, this court has the appropriate tools to compel compliance, including recalling its mandate, *see* RAP 12.9, or issuing a writ of mandamus to the legislature, *see, e.g., Walker v. Munro*, 124 Wn.2d 402, 408, 879 P.2d 920 (1994) ("Where there is a specific, existing duty which a state officer has violated and continues to violate, mandamus is an appropriate remedy to compel performance.").

¶181 In deciding the issues presented, we have met our constitutional responsibility; we should allow the legislature to do the same. With these concerns, I respectfully concur.

J.M. JOHNSON, J., concurs with MADSEN, C.J.